## TONNAGE TAX CASES.

### The Commonwealth *versus* The Erie Railway Company.

### Same *versus* The Lackawanna and Bloomsburg Railroad Company.

### Same *versus* The Monongahela Navigation Company.

### Same *versus* The Cleveland and Pittsburg Railroad Company.

### Same *versus* The Philadelphia and Reading Railroad Company.

1. In a question whether a state law is against the Constitution of the United States, a simple doubt should determine it in favor of the state.

2. The Act of April 25th 1864, ¿ 1 (Tonnage Tax), is solely a revenue law, and is constitutional.

3. Eminent domain is one of the reserved state rights, and directly connected with the enactment of revenue laws.

4. Internal improvements by states have been under the power of eminent domain ; not under any authority to regulate or aid in the execution of the Federal power over interstate commerce, but under the power to improve their own resources and regulate their internal affairs.

5. For her internal improvements, the state has a right to compensation from all who use them, as a necessary consequence of her power to construct them.

6. The state may take compensation by a direct charge on the tonnage using the road, or a tax on the corporations using her franchises.

7. The right to demand tolls, &c., is derived from the state's grant, and the power to determine the extent is subject to her discretion, except so far as she may be limited to use it, so as not to interdict or ruinously affect the commerce of another state.

8. Carriage, not destination, gives the right of toll, tax or charge.

9. The tax under the Act of 1864 is merely a charge on the corporation for freight carried over the road, levied on all and rated equitably according to the character of the freight and the expense of moving it : it is a tax on the business, measured by the number of tons carried.

10. Taxation is an independent power of the state, fundamental and vital, unlimited except by the express prohibitions of the Federal Constitution or by implication when it infringes directly on the exercise of Federal power.

11. There is a substantial distinction between an act which is simply a burthen on commerce and one which attempts to regulate it.

12. A contract of the state will not justify the state in imposing a tax which is in contravention of the Federal Constitution.

May 19th 1869.    Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

[Commonwealth v. Philadelphia and Reading Railroad Co.]

Writs of error to the Court of Common Pleas of *Dauphin county:* Nos. 60, 61, 62, 66, 67, 68.

These cases in the court below were appeals from settlements by the accounting officers of the Commonwealth charging the several defendants with tonnage tax under the Act of April 30th 1864, § 1, Pamph. L. 218, Purd. 1377, pl. 2. The section is as follows :—

"In addition to the taxes now imposed by law, hereafter every railroad, steamboat, canal, slack-water navigation or other transportation company doing business within this Commonwealth, shall * * * make quarterly returns * * * of the number of tons of freight traffic carried or moved by said company during the three months previous, * * * and shall pay the following taxes, to wit: 1st class, products of mines, two cents per ton ; 2d, product of forests, animal or vegetable food and all other agricultural products, three cents ; 3d, upon merchandise, manufactures and all other articles, five cents."

The section further provides that where the freight is carried over different continuous lines the tax shall be paid by each company in proportion to the distance carried as may be adjusted among themselves, the state treasurer being authorized to collect the whole from any one of the companies.

On the 11th of July 1866 the following account was settled against the Erie Railway Company :—

"Dr. For tax on tonnage per Act of August 25th 1864, for the quarter ending May 31st 1866, as per report herewith filed :—
Second class, 5274 tons, tax 3 c. per ton   .  .  $158.22
Third  do  9431    do  5    do  .   .  .  471.55

Due Commonwealth  .   .   .   .   .   .  $629.77

"This account does not include the tonnage passing through the state of Pennsylvania to or from other states, but includes the tonnage delivered in Pennsylvania from other states or taken from Pennsylvania to other states."

On the trial of the appeal it was conceded that of the $629.77 charged, all but $5.15 was tax on freight either delivered in Pennsylvania from another state, or taken up in Pennsylvania and carried to another state.

The jury, under direction of the court, rendered a verdict for Commonwealth for $5.15.

Another settlement was made against the same company, on the same day, on similar subjects. The amount of tax assessed was $7380.93.

It was conceded on the trial of the appeal that in said settlement, the defendants were charged with an aggregate tax of $6334.00 on 123,000 tons of freight passing over the road of the

[Commonwealth *v.* Philadelphia and Reading Railroad Co.]

company, and which was not both taken up and delivered at points within the state of Pennsylvania.

Pearson, P. J., instructed the jury to find for the defendants.

On the same day a settlement was made against The Lackawanna and Bloomsburg Railroad Company, on similar subjects, the tax assessed was $5069.38.

It was proved on trial of the appeal that of the sum charged, $2648.25 was a tax on 127,632 tons of freight manifested and transported to or from points not within the state of Pennsylvania, over a continuous chain of roads, of which the Lackawanna and Bloomsburg Railroad Company is a part, which freight in transhipment underwent no change of cars.

Judge Pearson directed the jury to find for the plaintiff $2580.11.

On the 18th of October 1866 a settlement was made against The Monongahela Navigation Company, on similar subjects; the tax assessed was $12,553.53.

On the trial of the appeal it was conceded by the Commonwealth, that the sum of $12,553.53, with which the company is charged in the settlement, was the aggregate tax on 627,676 tons of freight carried over the defendant's lines from a point within the state of Pennsylvania to a point without the state.

Judge Pearson directed the jury to find for the defendants.

On the 18th of October 1866 a settlement was made against The Cleveland and Pittsburg Railroad Company, on similar subjects: the tax assessed was $1951.93.

It was conceded on the trial of the appeal that of the amount charged against the company, $1685.46 was a tax on 47,820 tons of freight carried from some point within the state of Pennsylvania to some point without her borders.

Judge Pearson directed the jury to find for the Commonwealth $281.11.

On the 25th of October 1866 a settlement was made against The Philadelphia and Reading Company, on similar subjects : the tax assessed was $84,881.41.

It was proved on the trial of the appeal that in said settlement, the defendants were charged with an aggregate tax of $46,520, on 2,326,002 tons of freight originating in Pennsylvania, and carried by the defendants to the terminus of its road in Pennsylvania, and thence transhipped by a continuous line of transportation, by other companies, out of the state. It was shown on the trial that $38,361.41 had been paid by the defendants on account, leaving due the $46,520 above mentioned.

Pearson, P. J., instructed the jury to find a verdict for the defendants.

The specifications filed with the appeal were substantially the same in all the cases, viz.:

[Commonwealth *v.* Philadelphia and Reading Railroad Co.]

" That the Act of August 25th 1864 is unconstitutional and void, to the extent that it imposes a tax upon freight other than that both received and delivered within the state of Pennsylvania, because the same conflicts with paragraph 4, section 8, article 1, of the Constitution of the United States, giving to Congress the power to regulate commerce with foreign nations and among the several states; and with paragraph 2, section 10, of article 1, of the Constitution of the United States, which provides that no state shall, without the consent of Congress, lay any impost or duties on imports or exports, except what may be absolutely necessary for executing its inspection-laws."

The charge of the court was delivered *in extenso,* only in the last case; against the Philadelphia and Reading Railroad Company. In the other cases, the judge charged that they came under the rulings in that case, in which, amongst other things, he said, in relation to the Act of August 25th 1864:

" Where freight is loaded on the cars of the company and brought to Richmond, or any other point, for sale, it is subject to the tax, although it may be sold to be shipped abroad. When the article is sold for foreign shipment, before being loaded on the defendant's cars, is then placed thereon and carried directly to the point of transhipment, loaded on vessels and actually sent into other states or foreign countries, the railroad company is not bound to pay any tax on such tonnage. To apply the Act of Assembly to such tonnage, would be a burden on the commerce of the state to which it is to be carried, and thus far be a regulation of commerce between the states in violation of the federal compact, and the statute cannot be so construed without rendering it unconstitutional. You will, therefore, render your verdict in favor of the defendant for all taxes charged on the tonnage carried on the road, originally destined for other states or foreign countries and so sent, and in favor of the Commonwealth for all other taxes thereon, if not already paid."

The Commonwealth took a writ of error in each of the cases: the error upon which the cases were considered was the instruction that " the Act of August 25th 1864 is unconstitutional, in so far as it imposes a tax on tonnage other than that both received and delivered within Pennsylvania."

The cases were argued for the Commonwealth by *L. Waln Smith,* Deputy Attorney-General, and *B. H. Brewster,* Attorney-General.

*J. E. Gowen* and *J. C. Kunkel* (with whom was *R. A. Lamberton*), argued for the Philadelphia and Reading Railroad Company, and *J. W. Simonton* and *J. C. Kunkel,* for the other defendants in error.

12 P. F. Smith—19

[Commonwealth v. Philadelphia and Reading Railroad Co.]

For the Commonwealth:—This law is not a regulation of commerce: Thurlow v. Massachusetts, 5 Howard 504 (License Cases); Smith v. Turner, 7 Id. 283 (Passenger Cases); Nathan v. Louisiana, 8 Id. 73; Almy v. California, 24 Id. 169; Biddle v. Com., 13 S. & R. 408; Penna. Railroad v. Commonwealth, 3 Grant 129; State v. Delaware, Lack. & W. Railroad, 1 Vroom 483; State v. North, 27 Missouri 464; Paddleford v. Savannah, 14 Geo. 483. The law is local in its operation, and, inasmuch as Congress has not exercised its power in the premises, and has enacted no law with which this Act conflicts, the same is constitutional: Sturgess v. Crowninshield, 4 Wheaton 122; Gibbons v. Ogden, 9 Id. 1; Houston v. Moore, 5 Id. 1; Willson v. Blackbird Marsh Co., 2 Peters 245; New York v. Miln, 11 Id. 102; Achison v. Huddleson, 12 Howard 293; Cooley v. Wardens, Id. 319; Hays v. Pacific Mail Steamship, 17 Id. 596; Conway v. Taylor, 8 Black 603; Haldeman v. Beckwith, 4 McLean 286; Flanagan v. Philadelphia, 6 Wright 231; Smith v. People, 1 Parker's C. R. 583; Commonwealth v. N. Bedford Bridge Co., 2 Gray 339; Lunham & Lamphire, 3 Id. 272; Freeholders v. State, 4 Zabriskie 718; Beall v. State, 4 Blackf.; Chitrers v. People, 11 Mich. 43; Port Warden v. Ship L. M. Ward, 14 La. Ann.; Commissioners v. Cuba, 28 Ala. 185; Newport v. Taylor, 16 B. Mon. 699; Mitchell v. Steelman, 8 Cal. 363; Smith v. Marsden, 5 Texas 432; Erie Railroad Co. v. N. Jersey, 2 Am. Law Reg. N. S. 238. In the absence of the exercise of United States authority, the states may regulate navigable streams: Woodman v. Kilbourne Man. Co., Am. Law Reg., February 1867, p. 241. The road of the defendants is not a highway of nature, but an artificial one, and the state might have refused to allow the same to cross its territory. Having permitted it to be built, its power of taxation over the same is unlimited except so far as controlled by the terms of her grant to the company: Passenger Cases, *supra;* Veazie v. Moor, 14 Howard 568; Kelley v. Union Co., 12 Conn. 7; Thames Bank v. Lovell, 18 Id, 500.

For the Philadelphia and Reading Railroad:—A tax imposed expressly on freight coming into and going out of the state would be a regulation of commerce: Brown v. Maryland, 12 Wheaton 419; Gibbons v. Ogden, 9 Id. 189; Passenger Cases, *supra;* Miln v. N. York, 11 Peters 102; Cooley v. Wardens, 12 Howard 311; Steamship Co. v. Wardens, 6 Wallace 31; State v. North, 27 Missouri 405; State v. Kennedy, 19 La. Ann. 397; Erie Railway Co. v. State, 2 Am. Law Reg. N. S. 238. The tax attempted to be imposed upon the transportation of freight destined for exportation beyond the limits of Pennsylvania is prohibited by the clause of the Constitution which forbids any state laying imposts or duties on imports or exports: Brown v. Maryland, *supra;* Almy v. California, 24 Howard 169; Dobbins v. Commissioners of Erie,

16 Peters 435; Bank of Commerce v. N. York, 2 Black 620; Penna. Railroad v. Commonwealth, 3 Grant 129.

For the other defendants in error:—Commerce means intercourse with foreign nations and our sister states for the purpose of trade: Corfield v. Coryell, 4 Wash. C. C. R. 398; Gibbons v. Ogden, Passenger Cases, *supra;* Groves v. Slaughter, 15 Peters 511. The power of Congress to regulate commerce among the several states is exclusive of interference by the states: Grove v. Slaughter, *supra ;* N. York v. Milne, *supra ;* 2 Story on Const. § 1063; State v. North, 27 Missouri 464. Any tax or burden on articles of traffic carried from state to state is a regulation of commerce: McCulloch v. Maryland, 4 Wheaton 430. This act is a law regulating commerce: Brown v. Maryland, *supra;* License Cases, 5 Howard 576; Erie Railway v. N. Jersey, 31 N. J. 531; Almy v. California, *supra;* Carson River Co. v. Patterson, 33 Cal. 334; Gibbons v. Ogden; Brown v. Maryland, *supra ;* People v. Donner, 1 Cal. 169; Brunnagen v. Tillinghast, 18 Id. 266; People v. Raymond, 34 Id. 492; State v. Kennedy, *supra.*

The opinion of the court was delivered, July 6th 1869, by

AGNEW, J.—Although disagreeing with the learned judge of the court below in these cases, we must concede the ability with which he has handled the question in them. But a case of simple doubt should be resolved favorably to the state law, leaving the correction of the error, if it be one, to the federal judiciary. The presumption in favor of the acts of a co-ordinate branch of the state government, the relation of her courts to the state, and above all the necessity of preserving a financial system, so vital to her welfare, demand this at our hands. When convinced that the state law is really repugnant to the Federal Constitution we must yield to the supreme authority of the latter.

The question before us arises under the Act of the Legislature of Pennsylvania, approved August 25th 1864, entitled " An Act to provide additional revenue for the use of the Commonwealth," Pamph. L. 1864, p. 988. It is solely a revenue law, has no other purpose, and is in substance this:—That the financial officers of all railroad, steamboat, canal, slack-water navigation and transportation companies (excepting turnpike, plank-road and bridge companies), upon whose works freights are transported by themselves or others, for freight or tolls, shall make quarterly returns to the auditor-general, stating fully and particularly the number of tons of freight carried over or upon their works, and shall pay to the state treasurer, for the use of the Commonwealth, a tax on each 2000 pounds of freight so carried at rates designated in the act, and founded on a classification of the freights, so as to distinguish between the heavy and bulky and the lighter kinds, and thus to graduate the tax equitably in order to meet the greater expense of

transportation.   The act also confines the tax upon freight carried over continuous lines by several companies to a single one, to be designated by the auditor-general, so as not to charge the tax twice on freights carried over the same line of improvements.

The corporations, defendants in the foregoing cases, dispute the validity of this tax, alleging that it is a regulation of commerce, or an impost act beyond the power of the state.   To solve the question it will be proper to notice first the admitted relations between the federal and state governments.   Upon the declaration of the independence of the colonies, in 1776, they became separate and sovereign states; the rights of the crown devolving upon them by revolution being confirmed to them by the treaty of peace.   In entering into the Federal Union they parted only with some of their sovereign powers, all the undelegated and unprohibited being reserved to the states or to the people thereof:  Amendments Const. U. S., art. 10; McIlvaine *v.* Coxe, 4 Cranch 209; Cohens *v.* Virginia, 6 Wheat. 414; Briscoe *v.* Bank of Kentucky, 11 Peters 258.   Each government, state and federal, is sovereign within its own sphere:  Gibbons *v.* Ogden, 9 Wheat. 1; McCulloch *v.* Maryland, 4 Id. 316; Bank U. S. *v.* Daniel, 12 Peters 33; Bank Augusta *v.* Earle, 13 Id. 520; Briscoe *v.* Bank of Kentucky, *supra;* Ohio L. Ins. Co. *v.* Debolt, 16 How. 428; Dodge *v.* Woolsey, 18 Id. 349; Ableman *v.* Booth, 21 Id. 506.

In speaking of "that immense mass of legislation which embraces everything within the territory of a state not surrendered to the general government, all of which can be most advantageously exercised by the states themselves," Chief Justice Marshall says:  "Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the *internal commerce* of a state, and those which respect turnpike roads, ferries, &c., are component parts of this mass:" Gibbons *v.* Ogden.  Among the most important reserved state rights, and one directly connected with the question before us, is that of eminent domain. This undoubted power has been exercised in the improvement of navigable streams, and in building and establishing ferries over them, and in the construction of roads, turnpikes, canals and railroads; and has been repeatedly recognised in authoritative decisions.   Rivers: See Willson *v.* Blackbird Creek Co., 2 Peters 245; Martin *v.* Waddell, 16 Id. 367; Kelly *v.* Union Co., 12 Conn. 7; Thames Bank *v.* Lovell, 18 Id. 500; Veazie *v.* Moore, 14 How. 568.  Bridges: Pennsylvania *v.* Wheeling Bridge Co., 18 Id. 430; Gilman *v.* Philadelphia, 3 Wallace 713; The Passaic Bridge, Id. 782; Flanagan *v.* Philadelphia, 6 Wright 231.   Ferries: Conway *v.* Taylor, 1 Black 603; Freeholders *v.* New Jersey, 4 Zabriskie 718.   Under this invaluable power the states have built up a net-work of railways and canals, and have improved natural channels through which the commerce of the whole Union

is coursing, like the life blood throughout the natural system. This was not done under any supposed authority to regulate inter-state commerce, or to aid in the execution of the federal power over commerce between the states; but was done under the unquestioned power of the state to improve her own resources, and to regulate her internal affairs. Yet does any one doubt the grand and beneficial impulse given to interstate commerce by this exercise of state power? And who can doubt that the state has a right to compensation for this expenditure of her means and the benefit she has conferred on all who use her works? They were built by herself or under her franchises, and the right to exact tolls, charges and fares for their use, is a necessary conse-quence of her power to construct them. Nor does it make any difference what form her compensation takes—whether that of a direct charge on the tonnage using the road, or that of a tax on the corporations who use her franchises—her right is to exact the compensation from those who use the works. To gainsay this is to deny her right of eminent domain, and her power to legislate upon her internal affairs and the creations of her own sovereignty. If these works were, as once some of them were, in her own hands, what provision in the Federal Constitution would forbid her to increase her revenue by an increase of the charge of transportation over them? When in the hands of creatures exercising her franchises, what clause in any instrument forbids her to tax the franchises, and to authorize the tax to be added to the pre-exist-ing tolls and charges? To legislate once, is not to exhaust her power over the subject of tolls or charges, but to legislate at all is to assert her power. Whether it be called a toll or tax, what is this but to increase a charge which she can rightfully demand? The right to demand any toll or charge upon all articles trans-ported, or fares for passage, is derived from her grant, and the power to determine their extent depends on her discretion. It is a right of which she cannot be deprived, and of which she is the only judge, unless perhaps the power should be so unreasonably and oppressively exercised as to afford evidence of a design by a fraudulent use of the power to interdict or ruinously affect the commerce of other states. To say, because her citizens engage in mining for an extra-territorial market, or because merchandise may pass over these works out of or into the state, that to exact tolls and charges for the minerals or merchandise transported over them, or to tax the franchises of those engaged in the work, is a regulation of commerce, is to confound all just distinctions, and to destroy the most sacred right of a state. Her power to levy revenue from transportation over these works may be seen in her power over the works themselves. If compensation were denied her by way of revenue, who can dispute her power to suffer her own works to fall into decay and ruin; or, when unfettered by a

[Commonwealth *v.* Philadelphia and Reading Railroad Co.]

charter contract, to repeal the charters under which they were built. Interstate commerce might suffer, but what power could control the act? Then on what principle is it she cannot levy a tax on these instrumentalities for the privileges granted, because the products carried are destined for points without, or from without to points within the state? It is carriage, not destination, which gives the right of toll, tax or charge. It is not levied on them because the products go out or come in, but because they have the privilege and the benefit of transportation. They are not arrested and forbidden to enter or leave the state till a charge is paid—that would be a duty on imports or exports, and a regulation of interstate commerce. They are not discriminated against and required to pay more than others pay, because they go out or come into the state—that would be a regulation and a tax on interstate commerce; but they pay as all other products carried within the state pay, a charge for transportation—no more, no less, but the same exact freight paid by all others. The tax in this case is merely a charge upon the corporation for the freight carried over the road, levied equally on all, and rated equitably according to the character of the freight and the expense required to move it. It is clearly nothing but a tax on the business of the road, measured by the number of tons carried over it.

But the right to impose it does not rest solely on the ground of compensation for the use of works constructed under the eminent domain of the state, though this fact stamps the subject of taxation with its true character. Taxation is an independent power of the state, both fundamental and vital; and unlimited, except by the express prohibitions of the Federal Constitution, or by implication when it infringes directly on the exercise of federal power. "It is admitted (says C. J. Marshall) that the power of taxing the people and their property is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the government may choose to carry it." "The sovereignty of the state (he says) extends to everything *which exists by its authority*, or *is introduced by its permission*, but does not extend to those *means* which are employed by Congress to carry into execution powers conferred on that body by the people of the United States:" McCullough *v.* Maryland, 4 Wheat. 316. These principles furnish a solution to the question before us. The works over which this tonnage is transported owe their existence to the state. That which is transported is carried by the permission of the state, contained in the charters granted by the sovereign power. The business done upon them was the object and is the result of the exercise of that sovereignty. It bears no touch of the federal power. It is forbidden by no prohibition of state power. It owes its existence to no purpose, and no law of Congress, and was not

[Commonwealth *v.* Philadelphia and Reading Railroad Co.]

created to carry out any one of the powers of the Union. It being an undoubted creation of the state, and a subject of state sovereignty, it is therefore clearly within the state power of taxation. Hence it is immaterial how the subject of taxation is measured, by weight or by enumeration. The Pennsylvania ton of 2000 pounds is a convenient and equitable means of measuring the subject of the tax, and in ordinary speech it is called a tonnage tax, or a tax on weight. But it is not on this account to be confounded with the tonnage of capacity, forbidden by the Federal Constitution to be taxed by the state. And it is evident it does not matter whence or whither these tons travel, so that there be no discrimination, to forbid or to burden their entrance into or exit from the state, and being a tax on the benefit and the privilege of transportation on works constructed for this end, it bears equally on all. Nor can it make any difference, as we have already seen, that the company is allowed to add this tax on its franchises to the tolls or charges on the freight itself. It is the owner of the freight who enjoys both the privilege and the facility this valuable franchise affords, and whose toll could be increased by the state to the same extent if the works were in her hands. It falls upon those who use the road, not because it is a regulation of commerce, but because it is a subject of internal regulation, to which he is bound to contribute. There is in fact and in authority a substantial distinction between an act which simply operates as a burden on commerce and one which attempts to regulate it. No one can doubt the power of a state to tax her own coal, iron, lumber, grain and other products of her mines and soil, and the persons and occupations of those engaged in their production or their transportation, and yet these burdens eventually fall on those who consume them, whether they live in or out of the state. Clearly such taxation is no regulation of commerce. The state in laying a common tax on all such articles is not bound, and cannot be presumed to know where they will be consumed, nor to inquire their destination of those who traffic in or transport them. If she do not discriminate between that which goes out or comes in and that which remains within, it cannot be said that she in any sense attempts to regulate commerce with other states, or to impose a duty on imports or exports. In principle, where there is no discrimination, there is no difference between a tax on a transporter, whether in gross or measured by the tons he carries, and a tax on the farmer, the manufacturer, the miner, the merchant or the broker, measured by the business he does. Yet all the impositions are burthens which reach the consumer wherever he lives. The fallacy of the argument which insists that the burdens of internal transportation shall not be shared by the distant consumer, on the ground that it is an import or export duty, or a regulation of commerce, is seen in the fact that to exempt articles going out

of the state would be to discriminate in favor of the foreign and against the domestic consumer. Coal carried from the mines to Richmond, on the Delaware, and there disposed of, is conceded to be liable to the tax, but if intended to be sent forward to places without the state, it is said not to be liable; what is this but to impose a tax on our own citizens, which those beyond the state are not to bear? Pennsylvanians are citizens of the same Union and entitled to its equal protection against such discrimination.

This leads to a more particular consideration of what is meant by a *regulation* of commerce. The subject was so thoroughly examined and stated by Chief Justice Marshall in Gibbons *v.* Ogden, 9 Wheat. 1, that case remains until this day as a landmark in the interpretation of the Federal Constitution. "Commerce," he says, "describes the commercial intercourse between nations and parts of nations in all its branches, and *is regulated by prescribing rules for carrying on that intercourse.*" Again: "It is the power to regulate, that is, *to prescribe the rules by which commerce is to be governed.*" This accords also with the root and definition of the word. "Regula, a rule—Regulate, to adjust by rule—as to regulate weights and measures—to regulate the assize of bread—to regulate trade:" Webster. Now, clearly this tax was not imposed or intended to be a rule to regulate traffic or intercourse, but was a simple measure of revenue. The purpose was not to regulate transportation, but to raise money for the support of government. This exercise of authority flows from the power to tax for revenue, not from a power to control commerce.

This distinction is very clearly stated by C. J. Marshall, in Gibbons *v.* Ogden, proving that the prohibition to lay imposts or duties on imports or exports and a duty on tonnage, is an exception from the state power of *taxation*, and not from the power to regulate commerce. This tax being a revenue measure and not a regulation of trade, it is very clearly not a duty on exports or imports or on tonnage. "An impost or duty on imports," says the same judge, "is a custom or tax levied on articles brought into a country:" Brown *v.* Maryland, 12 Wheat. 419. The same definition will apply, *e converso*, to articles taken out as a duty on exports. That the tax in this case is not such a duty is manifest from what has been said. The law does not single out the freight going out or coming in and lay the tax accordingly. It is not a price paid for admission or departure. It meets the articles neither at the state line nor elsewhere with a license to be paid for entrance, exit, or sale. Nor is the tax a tonnage duty laid on vessels or the means of freightage necessary for the purpose of commerce to and from the state. It is simply a tax on internal carriage, not differing in principle from a tax on draymen, stage companies or other taxes on railroad and navigation companies,

[Commonwealth *v.* Philadelphia and Reading Railroad Co.]

admitted to be lawful. *Tonnage-duties* are duties laid on the carrying capacity of vessels, the only means or instruments of distant commerce known at the adoption of the constitution, though doubtless the principle is applicable to railroad tonnage as a means of external commerce. The early act of Congress of July 20th 1790, regulating tonnage duties, provides that upon all ships or vessels which shall be entered in the United States from any *foreign* port or place, there shall be paid the several and respective duties following. That is to say, &c. The Act of March 2d 1799, provided the rule for the measurement of the tonnage of each vessel. The nature of the subject, the legislation and practice of the government, and the well known meaning of the terms used, render it clear that the tax in question is not a duty on exports or imports or on tonnage.

That the positions taken in this opinion are sound is proved, I think, by the very cases cited as authorities against the tax. The grounds on which they are severally rested as violations in each case of the prohibitory clauses of the Constitution, or as specific restrictions upon commerce, and the recognition in nearly all of them of the power of the state to impose taxes on internal commerce, proves with clearness that the tax in this case falls within the scope of none of the cases.

Brown *v.* Maryland, 12 Wheat. 418. The case, perhaps, most relied on bears no analogy in features or principles. The question as stated by C. J. Marshall, was "whether the legislature of a state can constitutionally require the importer of foreign articles to take out a license from the state before he shall be permitted to sell a bale or package so imported." It was held that this was a tax on imports and also a regulation of commerce, on the ground that sale is the object of importation, and a restraint upon it is a regulation of intercourse. Stress has been laid upon the illustrations used by the Chief Justice, in his argument against the power of a state to impose injurious burthens on commerce, as for instance, to tax goods in transit through the state from port to port for the purpose of *re-exportation*, or articles passing through for the purpose of traffic, or the transportation of goods from the state itself to other states for commercial purposes. But the Chief Justice had reference to specific burdens. These subjects must not be singled out and taxed, for this would be discrimination affecting intercourse, invidious and inviting retaliation from other states or foreign powers. He did not mean by these illustrations that those who use the artificial works, constructed by the state or under their franchise, might so do without compensation because they transported their goods on them for such purposes, or that they are not bound to share with our citizens the equal burden which is the price they must pay for availing themselves of these facilities. The entire opinion of C. J. Marshall in that

case, and in Gibbons *v.* Ogden, shows that he never meant to carry the doctrine of federal intervention to such a wild length within the domain of the state. A full answer to such an argument is found in the recent tax cases, 5 Wallace 462 and 474, deciding that a law of Congress gives no authority to carry on a business within a state forbidden by its laws. The Chief Justice says of the power of the state, " But very different considerations apply to the internal commerce or domestic trade of the state. Over this commerce Congress has no power of regulation nor any direct control. This power belongs exclusively to the state." To these cases may be added the license cases (5 How. 504), supporting the state power to require a license to carry on a certain traffic in imported articles even in the barrels or cases in which they had been imported.

McCullough *v.* Bank of Maryland, 4 Wheat. 316; Weston *v.* City of Charleston, 2 Peters 449; Dobbins *v.* County of Erie, 16 Id. 435; Bank of Commerce *v.* City of New York, 2 Black. 620. These cases need no comment, but to say that they rest on the ground that the state government cannot lay a tax on the constitutional means employed by the government of the Union to execute its constitutional powers. Therefore the loans, fiscal means and salaries of officers of the federal government cannot be taxed by the states, as they might be taxed out of existence. But even this protection has its limits, when these things become mingled in the mass of state property, as is evidenced by the Bank Deposit Cases, 6 Wallace 594, 611, which hold that deposits of savings institutions invested in United States securities are liable to taxation notwithstanding the securities themselves are exempted. The tax being in fact on the franchise and not on the security. The analogy between that tax and the one before us is striking, the franchise being the subject and the burden on property the effect.

The Passenger Cases reported in 7 Howard 283, have been largely cited from in the argument. From the strength and character of the dissents entered in them, it is difficult to determine the true value of these cases upon the points for which the views of the assenting and dissenting judges have been quoted. And it is not material, as the cases bear but little on the present question, while they illustrate the fact that a state law must operate directly as a regulation of commerce before it will be pronounced unconstitutional. In each of the cases the law was held invalid as a naked attempt to levy a tax on passengers from foreign ports, without any sufficient ground of state protection or service for which the tax could be exacted, and it was therefore not less a tax in effect though not in form on the vessel, and a regulation of commerce.

Hays *v.* Pacific Mail Steamship Company, 17 How. 596, is much the same in principle as the Passenger Cases. It was an

attempt on the part of California to impose a tax on New York vessels in the port of San Francisco. The law was directly extraterritorial in its operation and an interference with the state commerce.

Almy v. California, 24 How. 169. California levied a stamp duty on bills of lading of gold exported from the state. The necessary connection between the bill of lading and the shipment made it essentially a duty on the gold exported. The case was put on the ground that the tax was a duty on exports and not on the ground that it was a regulation of commerce. This case is valuable, because of the distinction between taxation and regulation and of the fact that the opinion was delivered by Taney, C. J., who had said in the Passenger Cases 480, after citing C. J. Marshall on the same point: "I may therefore safely assume, that according to the true construction of the Constitution, the power granted to Congress to regulate commerce did not in any degree abridge the power of taxation in the states." "They are expressly prohibited from laying any duty on imports or exports, except what may be absolutely necessary for executing the inspection laws, and also from laying any tonnage duty. So far their taxing power on commerce is restrained but no further. They retain all the rest, and that the money demanded is a tax on commerce, or the instrument or vehicle of commerce, furnishes no objection to it, unless it is a duty on imports or tonnage, for they alone are forbidden."

The State v. North, 27 Missouri (6 Jones) 464, so much relied on, proves nothing to the point. It was a case of direct discrimination against the citizens of other states, founded on a statute of Missouri, requiring merchants to "pay an ad valorem tax equal to what is laid on real estate, upon all goods, wares and merchandise purchased by them, except such as may be the growth, produce or manufacture of the state and except such unmanufactured articles as may be the growth and produce of other states. "It presented," said Scott, J., delivering the opinion of the court, "the question of the power of the state in the exercise of the right of taxation to discriminate between the products of this state and those manufactured in other states." It does not touch the present question, and one judge out of three dissented.

Erie Railway Company v. New Jersey, 4 Law Register 238, is a case of similar character to the last, and was decided upon a statute of New Jersey, imposing a transit duty on the corporations of other states laid on tonnage carried by them through New Jersey. The case fully concedes the power of a state to levy taxes which may incidentally affect interstate commerce, and places the invalidity of the tax on the ground of special discrimination. "This tax (said the Chief Justice) falls on interstate commerce alone. It reaches no further. The burthen is

not on general business, one branch of which is the transportation of extra-territorial goods. On the contrary the only business of the plaintiff which is *not* taxed, is the business of such company done entirely in New Jersey, and which does not consist of the transportation of merchandise from state to state. The law discriminates and selects the transportation of commodities passing from state to state as the *peculiar* objects of the duty." He then proceeds to show the true character of such discriminating laws or regulations of interstate commerce, and their disastrous effects on the relations of states.

Steamship Company *v.* Port Wardens, 6 Wallace 31. This case has no bearing on the point before us. It was a bald attempt to levy a duty of five dollars on every vessel entering the port of New Orleans, in the form of a fee to the master and wardens of the port, " whether called on to perform any service or not." It was held to be both a tax on tonnage and a regulation of commerce.

I have not been able to have access to the 19th volume of Louisiana Annual Reports, to examine the case of the State *v.* Kennedy. The quotation from it seems to have no special bearing on the case in hand. The last case is Crandell *v.* Nevada, 6 Wallace 35. Nevada enacted " that there shall be levied and collected a capitation tax of one dollar upon every person leaving the state by any railroad, stage-coach or other vehicle engaged or employed in the business of transporting passengers for hire," to be collected and paid by the carriers. A noticeable feature of this case is that the repugnance of the state law to the Federal Constitution is denied to rest on the ground that it is a regulation of commerce in conflict with the federal law, and it is placed on the restriction of the constitutional right of all citizens freely to pass to the seat of government, the seaports, the public offices, and to other points on business with federal agents and in the federal service. But had it been laid on other grounds, still like the Missouri and New Jersey cases, it was a clear case of discriminating against intercourse with other states, which, if admitted as a valid state power, could be carried to the point of interdiction by increased taxation.

I have deferred noticing the favorable case of the Pennsylvania Railroad Company *v.* Commonwealth, 3 Grant 129, because of the alleged distinction, that the tonnage-tax there is justified by the contract of the company found in its charter. But the decision was not rested on that ground; it was placed on the broad basis that the three mill tax per ton is simply a mode of taxing the company according to the magnitude of the business, justified by the nature of the subject and the power of the state over it, and is not repugnant to the powers conferred upon Congress or the prohibitory clauses against laying duties on imports, exports or

[Commonwealth v. Philadelphia and Reading Railroad Co.]

tonnage. Nor do I think that a contract relation helps the opposite argument. Let it once be conceded that the state law is in fact a regulation of interstate commerce, or imposes a tax on imports, exports or tonnage in the sense of the Federal Constitution, and the contract relation will not justify it. The state cannot accomplish by contract what she cannot accomplish by law.

The act we are now considering is in no sense a regulation of commerce or an attempt to tax interstate commerce. It is the lawful exercise of state power over creations and uses brought into existence by her own authority; a proper tax upon the use of the franchises granted by her for the benefit of all alike who employ them, and in consideration of valuable privileges and facilities furnished to them by her authority and permission. The subject is wholly internal and the imposition equal in its operation and equitable in its distribution; while to exempt freight passing out or coming into the state from its operations would be unjust discrimination against our own citizens and in favor of the citizens of other states. The case is not rested on the debatable ground of state power to regulate interstate commerce in the absence of congressional legislation on the same subject, but on the admitted right of a state to execute its power of eminent domain in the construction of works for the transportation of freight and passengers, and to legislate and tax their use by those who choose to employ them, as undoubted subjects of her domestic affairs and of that internal commerce which she can rightfully control so long as she does not fraudulently exercise her power to the injury of the citizens of other states.

For these reasons the judgments in all the cases are reversed, and a writ of *venire facias de novo* awarded in each case.

READ, J., dissented.