GLOBE ELEVATOR CO. v. ANDREW et al.

(Circuit Court, W. D. Wisconsin. April 20, 1906.)

No. 125.

**1. CONSTITUTIONAL LAW—EQUAL PROTECTION OF LAWS—SPECIAL ACTS.**

Laws Wis. 1905, p. 37, c. 19, as amended by Laws Sp. Sess. 1905, p. 19, c. 12, creating the Superior Grain & Warehouse Commission, and providing for the inspection and grading of grain at Superior, although applicable to that city alone, is not unconstitutional as denyng the equal protection of the laws, having in view the peculiar situation of Superior and the peculiar conditions with respect to the grain trade and commerce there existing, which places it in a class by itself distinct from all other cities in the state.

**2. STATUTES—SPECIAL ACT CREATING CORPORATION.**

Neither is such act void as in violation of the provision of the Constitution of Wisconsin prohibiting the granting of corporate power by special act, under the construction placed on such provision by the Supreme Court of the state, because it makes such grain and warehouse commission a corporation.

**3. COMMERCE—REGULATION OF INTERSTATE COMMERCE BY STATE GRAIN INSPECTION LAWS.**

A state may lawfully make local regulations affecting interstate commerce having for their object the protection of the public from fraud and imposition, and which are in aid of such commerce, but a matter like the fixing of grades by which grain may be sold in interstate commerce, and without which it cannot be sold on any large scale, is one which admits of only one uniform system of regulation, and is therefore within the exclusive power of Congress; and legislation by a state which attempts to impose its own inspection and grades on all grain sold, delivered, or stored within its limits, to the exclusion of those of other states, not only creates or invites a conflict with other states, but imposes a direct burden upon interstate commerce, and is unconstitutional and void as a regulation thereof.

**4. SAME—WISCONSIN STATUTE.**

Laws Wis. 1905, p. 37, c. 19, as amended by Laws, Sp. Sess. 1905, p. 19, c. 12, which provides for the inspection, grading, and weighing of grain at Superior, requires all grain sold, delivered, stored, or reshipped at that point to be in accordance with the weights and grades so es-

tablished and all warehouse receipts to be based thereon, prohibits the mixing of grades so made by warehousemen, and expressly prohibits any sales or deliveries under Minnesota grades, as applied to interstate shipments or deliveries is unconstitutional and void, as a burdensome regulation upon, and interference with, interstate commerce.

In Equity. On motion for preliminary injunction.

C. H. Crownhart, Solon L. Perrin, Koon, Whelan & Bennett, and James I. Best, for complainant.

John A. Murphy, for defendant Great Northern Ry. Co.

L. K. Luse and George B. Hudnall, for defendants Homer Andrew, M. F. Swanston, John D. Shanahan, Byron Kimball, and Peter S. Christenson.

SANBORN, District Judge. Cross-bill of the Great Northern Railway Company was brought against the complainant and all the other defendants.

In the city of Superior, Wis., lying in the extreme northwest corner of the state, and separated from the city of Duluth, in Minnesota, only by a navigable waterway, there are 15 large elevators and 6 flouring mills. The flouring mills have a capacity of about 75,000 bushels of wheat per day, or about 20,000,000 bushels per year. Part of the product of these mills is marketed in Wisconsin, and the balance is shipped to other states east of Wisconsin. The Great Northern Railroad extends from Minnesota into Wisconsin a few miles south of Superior, and runs northeasterly through the city of Superior, and thence to Duluth. The Northern Pacific Railway has a terminus at Duluth, and extends thence into Superior and east to Ashland, Wis. The St. Paul & Duluth Railroad, controlled by the Northern Pacific Railway Company, branches at West Duluth, about due west from the center of the city of Superior; one branch extending to Duluth, and the other across the St. Louis river to Superior. The Omaha Railway Company also extends from Minnesota into Wisconsin to Superior and Duluth, branching at Spooner, about 60 miles southeast of Superior. All of these railroads carry grain; a large part of it being carried by the Great Northern Company. The latter company has very large yards at Superior. The grain trade carried on all these roads amounts to about 40,000,000 of bushels a year.

Prior to the enactment of chapter 19, p. 37, of the laws of Wisconsin for 1905, and for a period of about 10 years, inspectors and weighmen, acting under the authority of the railroad and warehouse commission of the state of Minnesota, had inspected and weighed all grain received in Superior; many of these men coming from the city of Duluth daily for the purpose of doing this work. Being outside of the jurisdiction of their appointment and the jurisdiction of the laws under which they were appointed, they were not subject to any official oath; nor were they amenable to any law prescribing their duties or punishing the failure to perform them properly. Under this system, as might well be expected, grave abuses in the grain trade had grown up, and under such circumstances the Legislature of the state of Wisconsin passed the law in question.

The testimony further shows that, according to the reports of the railroad and warehouse commission, more grain was reported and certified as having been shipped out of Duluth and Superior than was received into these cities, after deducting, from the grain received, the grain that was milled or ground into flour and other food products; one witness placing the amount at 26,000,000 bushels for the 10 years from 1893 to 1902, inclusive. The testimony shows that this was brought about partly by docking all grain that arrived in the city from one-half to seven or eight pounds per bushel, whereas there was no dockage on grain shipped out of the city. There was also an arbitrary dockage in weights of grain going into the elevators of one-half bushel per car. There was also an undergrading of grain as it arrived in the city of Superior and Duluth, and an overgrading of the same grain when it was shipped out of these cities; the reports of the railroad and warehouse commission showing that a less number of bushels of the higher or best grades was received in than was shipped out, and a larger number of bushels of the lower or poorer grades was received in than was shipped out. The price of grain is fixed by grades. Consequently, when grain is received into Superior at a low grade, and shipped out at a high grade, the seller of the grain arriving in Superior receives a less price than the purchaser pays for the same grain when it is shipped out; the profits, of course, belonging to the middleman, the elevator company. This, in part, was the situation as shown by the evidence, when chapter 19, p. 37, Laws 1905, was passed by the Legislature, and the Legislature had these and other facts before them at the time of the passage of the act.

It further appears that the Great Northern Railway has for many years transported large quantities of grain, exceeding in value $1,000,-000 a year, from its railroad terminus in Superior to steamboats plying on the Great Lakes for the purpose of further transportation to eastern markets and foreign countries. In order to facilitate such commerce, it built large terminal railway yards and transfer and storage appliances and equipments, as well as two large elevators. It is, and for many years has been, engaged in transporting wheat, flax, oats, barley, rye, and corn received from shippers along its line in Montana, North Dakota, South Dakota, Iowa, Nebraska, and Minnesota; considerable of which grain being delivered by it into elevators in Superior. Prior to the enactment of chapter 19, p. 37, Laws 1905, cars arriving over the Great Northern usually came early in the morning. They were stopped in the yard, which is from two to eight miles from the elevators and mills to which considerable grain is finally delivered by the railway company, and the grain was there inspected by persons acting for the railroad and warehouse commission of Minnesota, under the Minnesota act of 1885. Grades were made called "Minnesota Grades," which were exhibited on the Board of Trade at Duluth, a body of about 300 members, and the grain was there bought and sold for delivery either in Superior at some elevator or mill or to some extent for delivery in Duluth. The cars remained in the yard during the day awaiting disposition pursuant to such sales, and the disposition of the day's shipments was not made until about

4 o'clock in the afternoon. By this time the cars were made up into trains for delivery either at the Great Northern elevators for shipment to Duluth to some extent or for delivery to the Superior Terminal & Transfer Railway Company, which is a belt line railway company connecting with all of the railroads running into Superior, and by said terminal company the cars of grain were delivered to other mills and elevators, or possibly to some extent for further shipment by rail eastward.

Substantially all the grain coming to Superior is produced in states other than Wisconsin, and its mill product is shipped to states east of Wisconsin, although a considerable amount of flour is marketed in Wisconsin by the mills. After the passage of chapter 19, p. 37 Laws 1905, objection was made to the inspection of the grain in Superior by agents of the Minnesota Warehouse Commission, and the mill and elevator owners and members of the Duluth Board of Trade, co-operating with the railroads, procured the stopping of the Great Northern cars at points on its line in Minnesota called Sandstone and Cass Lake, and the inspection which formerly was made at Superior took place at those points. After such inspection the transit was continued until the cars were stopped in the Great Northern yards at Superior, as already stated. The Northern Pacific cars containing grain were stopped in Duluth, and the inspection there made under the supervision of the Minnesota Commission.

It is charged in the answer that, after the passage of chapter 19, complainant conspired and combined with the owners, managers, and operators of the other elevators in Superior and of the mills, and the Board of Trade of Duluth and members thereof, not to buy or sell or manufacture any grain under the inspection, grading, or weighing of the Superior Warehouse Commission created by chapter 19, but to buy and sell all grain under Minnesota inspection and subject to weights to be made by designated agents of the Duluth Board of Trade. To this end the Duluth Board of Trade, in the summer of 1905, promulgated rules forbidding any of its members, under penalty of expulsion, from buying, selling, or handling any grain under Wisconsin inspection or weighing, from belonging to any other board of trade or like organization located within 100 miles of Duluth, and from maintaining or becoming interested, directly or indirectly, in any office or place of business outside of Duluth for the dealing in grain, and from becoming a stockholder in a corporation or member of a firm dealing in any grain dealt in or quoted upon the Duluth Board of Trade at any point within 100 miles of Duluth; and further requiring all persons applying for membership to the Duluth Board to sign an application containing an agreement that the applicant would resign his membership in said board within five days, if at any time he should violate such rules; and further requiring the applicant to use his influence towards the protection and upbuilding of the business of said board and its members in every way to the limit of his power and the best of his ability. It is further alleged in the answer that the Duluth Board of Trade, for the purpose of restraining trade and commerce among the several states, endeavored and attempted to

monopolize and control the market of grain by arbitrarily fixing a limit upon the price which should be offered or bid upon the board, and has prohibited and prevented its members from bidding on, offering to buy, or buying any grain at a higher price than so fixed, or buying or selling grain at any other place than upon the board, within 100 miles of Duluth. The result of this action on the part of the Board of Trade and the mill owners has been to compel those persons formerly buying and selling grain in Superior to become members of the Duluth Board of Trade, and to buy and sell all grain upon its floor.

The testimony shows that the railroads hauling grain have acquiesced in the action of the Duluth Board and the mill and elevator owners, and thus the market for grain in Superior has been destroyed and forced into the Board of Trade of Duluth and Minneapolis, and that the Great Northern has stopped its trains at Sandstone and Cass Lake for the purpose of Minnesota inspection accordingly.

It is alleged by the Great Northern Railway Company, in its cross-bill, that it receives an average of 500 cars of grain per day in its yard at Superior during the grain shipping season, about 365 cars of which are ordered in Superior elevators. It denies that it has ever been in concert or collusion with any grain interest or system of inspection or weighing, or with any of the defendants, but it responds to the express orders of its shippers and complies as best it can with federal law and authority governing the transit of such grain among the states. In respect to the Minnesota grain inspection law, the Great Northern Company in its cross-bill states that said law has been administered and in operation for many years, and that the owners, shippers, and receivers of grain generally in the northwest have for a long time made use of the instrumentalities of inspection, weighing, and grading afforded by the Minnesota law, and have by consent, choice, and agreement subjected practically all of their grain to such inspection, weighing, and grading, and such grades and certified weights for grain have been a medium between buyer and seller of establishing by mutual agreement of the parties all grades and weights upon which the grain could be handled. It further states that, without such mutual consent and agreement, the Minnesota inspection law is invalid and an unlawful exercise of state power as applied to interstate commerce, and would be an unwarranted, unlawful, and unconstitutional interference with such commerce.

The bill alleges that complainant for more than 10 years has owned, controlled, and operated three grain elevators in Superior known as the Globe elevators, worth exceeding $150,000, and having an aggregate capacity of 5,000,000 bushels, and for four years has controlled, managed, and operated under lease two others elevators called the Belt Line elevators, having a capacity of 2,500,000 bushels, and of the value of over $150,000; all of said elevators being situated on the Superior harbor accessible to steamboats and other craft plying upon the Great Lakes, and also connected with all the railroad terminals. That its business for 10 years has been buying, selling, handling, and shipping grain bought by it upon the Minneapolis Chamber of Commerce and Duluth Board of Trade, being the largest and only prin-

cipal markets for the purchase and sale of grain in the northwest, and being the only places at which it can buy·grain in sufficiently large quantities to enable it to operate such elevators. That its business is large, and that it makes a profit thereon of about $100,000 a year; and it alleges that its business will be destroyed by the putting in force of the legislation of Wisconsin referred to. It further alleges that all the grain handled by it is bought and sold upon Minnesota grades; that it cannot buy or sell any grain in Superior; and that its business will be seriously injured, if not destroyed, by the execution of such Wisconsin legislation.

Chapter 19, p. 37, Laws 1905, creates a corporation known as the Superior Grain & Warehouse Commission, and provides for the regulation of public warehouses. Its chief purpose is to create a system of Wisconsin inspection, and fully enforce the same through strict penal provisions, and incidentally prevent the sale of grain by the fraudulent Minnesota system. This purpose is sought to be accomplished: First, by carefully drawn provisions governing the inspection and weighing of grain milled, bought, or sold in Superior, or stored or shipped from Superior elevators or warehouses; second, by exhaustive and thorough regulation of the grain warehouse business in Superior; and, third, by provisions making the sale, purchase, or delivery of grain under the Minnesota inspection system difficult, if not impossible. The intent of the law seems to be to destroy the Minnesota system, because it is fraudulent, and to substitute therefor the Wisconsin system.

Provisions as to inspection and weighing: The commission is given power to superintend the inspection, weighing, and grading of all grain milled, bought or sold, or stored and shipped in Superior, to appoint inspectors and weighmasters, make regulations for inspection, weighing, and grading, and make and collect charges therefor. Sections 5, 22, 28. It may pass on inspection on appeal from inspectors, and its decision is made final. Section 25. May establish grades of grain to be known as "Superior Grades." Section 38. It may seize and sell grain for inspection fees, and may sue to collect them. Section 65. When the grain is in transit, the fees are to be treated as advance charges payable by the carrier. Section 33. Carriers and elevators must furnish free access and use of their scales to the weighmaster. Section 24. The chief inspector shall open the cars on their arrival in Superior, examine them, inspect the grain, and close and reseal the doors with the Wisconsin seal. Section 48. Assuming to act as an inspector without appointment under the statute is made punishable by fine. Section 31. Section 2, c. 317, p. 488, Laws 1905. Negligent inspection and bribery of inspectors are made misdemeanors. Section 32. Samples of grain are to be furnished by the commission to warehouses, at their request. Section 39. Shall keep records. Section 47.

Regulation of elevators and warehouses: All elevators and warehouses in Superior doing business for a compensation, or in which the grain of different owners is stored in bulk or mixed together, or so stored that the identity of different lots and parcels cannot be

accurately preserved, and all elevators and warehouses issuing ware-house receipts for grain, are made public elevators. Section 6. The commission may, whenever in its judgment the same is advisable, by reason of weather conditions or because of rust, smut, blight, or other defects, *or by reason of competitive markets or inspection* affecting the handling, storage, sale, or other disposition of grain, give written per-mission to any elevator or warehouse for a period of six months at any one time to mix the grain of different owners, store without pre-serving identity, and issue warehouse receipts without becoming sub-ject to the provisions hereof, except all grain shall be weighed under such provisions. Chapter 317, p. 487, Laws 1905, repealed by section 74, c. 12, p. 25, Sp. Sess. 1905. The italics refer to the Minnesota in-spection and sales. Such public warehouses are required to take out li-censes issued by the commission, revocable if the act be violated (sec-tion 7), and give bonds for a faithful observance of the law, for $10,000. Section 8. Doing business without license is made punishable by fine of $100 to $500 for each day. Section 9. Public warehouses must receive for storage all grain offered which is suitable for storing, without discrimination; such grain to be inspected and graded by an inspector under the act, and stored with grain of similar grade; and in no case shall grain of different grades be mixed, except if the owner or consignee so requests, and the warehouseman consents, his grain of the same grade may be kept in a bin by itself apart from that of other owners, to be marked "special bin." Inspection charges upon receipt and delivery shall be paid by the warehouseman, and may be added to storage charges. Section 10. Warehouse receipts may be issued, after payment of all transportation, inspection, and weigh-ing charges. They shall state on their face the quantity and grade of grain as fixed by the inspection provided by the act, and that the grain has been received into store to be stored with grain of the same grade, and is deliverable on return of the receipt properly indorsed. Section 11. Further regulations as to the issue of receipts, and for preventing fraud are contained in sections 12, 13, and 14. Reports of the warehouses to the commission are provided for by sections 15 and 16. Warehousemen must publish storage rates, and maximum rates are fixed. Appeals to the commission on the question of rates are provided for. Section 18, as amended by section 75, c. 12, p. 25, Sp. Sess. 1905. Mixing grain of different grades, and the selec-tion of different qualities of the same grade for the purpose of storage or delivery, is made unlawful, as well as the delivery of one grade for another, or tampering with grain to secure a profit. Special rules are made as to special grain. Section 19. Grain owners and inspectors may examine all parts of warehouses during business hours. Scales are made subject to examination by inspectors, weighmasters, and sealers of weights and measures. Section 20. The weighmaster is given exclusive supervision and control of the weighing of grain in mills and warehouses, and the inspection of scales. His certificate is made conclusive. Section 21. Weighmaster must give bonds, and his fees are fixed by the commission. Obstruction to the weighmaster in performing his duties is punished by sections 23 and 24. Any viola-

tion of the act is made a misdemeanor, punishable by fine and treble damages. Section 53.

Chapter 12, p. 19, Sp. Sess. 1905: This act amends chapter 19 by adding sections 58–80. Sectons 58, 59, 66, and 67 provide that all contracts of sale upon Minnesota inspection shall be void; that in all sales for delivery in Superior, or where the amount of the purchase price is to be determined by weighing the grain in Superior, or where such delivery or weighing is contemplated or afterwards takes place, such grain shall be deemed to have been bought and sold in Superior, and all such grain shall be weighed and inspected under this act; no sale of grain shall be made anywhere until it is inspected under the act, nor delivery be made; and no delivery to a carrier outside of Superior shall be deemed a delivery to the purchaser, unless the exact amount of the purchase price has been ascertained and paid; no person shall offer for sale or sell or deliver any grain in Superior, or deliver it to or from any elevator or warehouse in Superior, under the Minnesota grading, or upon any other grading than provided in the act; violation is made a misdemeanor, punishable as in section 53.

Provisions as to warehouses and elevators: No grain shall be stored or delivered from a warehouse or elevator under Minnesota inspection. Section 67. All grain delivered from elevators to cars or boats shall be presumed to have been delivered upon, in whole or in part, a contract of sale, and shall subject the grain to Wisconsin inspection and weighing. Section 60. Warehouse receipts issued for grain not under Wisconsin inspection shall be void. Section 62. No carrier shall deliver grain to any warehouse, elevator, or mill until the Wisconsin inspection fees are paid, under penalty of treble damages. Section 63. Railroad elevators or warehouses in Superior are declared public warehouses, so far as to require the road to receive and store, without discrimination, all grain carried on its line, whether by it directly or other company operating its line. Section 68. Such road is relieved from giving bond as warehouseman, but must file with the commission a written declaration in compliance with the act. Section 69. Lessees of railroad elevators are declared public warehousemen. Section 70. No person shall deliver grain from any elevator or warehouse until inspection and weighing, and payment of fees, under penalty of fine or imprisonment, or both. Section 72.

Provisions as to inspection: Inspection fees are a lien on the grain, and it may be sold or the lien foreclosed. Sections 64, 65. Every carrier bringing grain into Superior shall, before delivery, or setting the same off upon any track leading to any elevator, warehouse, or mill, and before delivery to any terminal company or other carrier, set out all such grain upon some one or more of the tracks in its yard convenient for the inspectors to inspect it, and shall set out and separate the cars of grain destined to be delivered in Superior from any passing through in transit, and furnish a list with initials and numbers of cars, names of consignor and the consignee, from where shipped, and where and to whom to be delivered, and furnish full and sufficient opportunity for inspection of any and all grain delivered in Superior before such delivery, whether to be delivered upon the original con-

GLOBE ELEVATOR CO. V. ANDREW.

signment or upon disposition subsequently given. Violation is made punishable by forfeiture of $100 for each carload. Section 71. No grain is to be delivered from any warehouse until inspection, grading, and weighing and fees paid, under penalty. Section 72. Resistance to the inspectors is made punishable by imprisonment or fine, or both. Section 73.

The Wisconsin statutes in question, in my opinion, give equal protection of the laws. The peculiar situation of the city of Superior in respect to the commerce carried on therein, and the peculiar conditions of that commerce put it in a class by itself, entirely distinct from other cities of the state with elevators, warehouses, and transportation facilities for handling interstate commerce. Consolidated Coal Co. v. Illinois, 185 U. S. 207, 22 Sup. Ct. 616, 46 L. Ed. 872; Missouri v. Lewis, 101 U. S. 31, 25 L. Ed. 989; Hayes v. Missouri, 120 U. S. 68, 7 Sup. Ct. 350, 30 L. Ed. 578. The statutes in question are special acts, and make the commission a corporation; and is argued that such acts are void under the Constitution of Wisconsin prohibiting the granting of corporate power by special act. These statutes are within the letter, but not the spirit, of the Constitution, as declared in State v. Stewart, 74 Wis. 620, 43 N. W. 947, 6 L. R. A. 394, and a federal court should follow such construction. The acts in question are not, therefore, invalid on that ground.

The important and vital question is whether these statutes are invalid as a regulation of interstate commerce. No doubt, the states are invested with large authority to pass inspection laws. indirectly affecting, and to some extent interfering with, commerce among the states. Many of such laws are not obstructive to commerce, but operate as an aid or encouragement to it. Such are acts compelling carriers to promptly and safely carry and deliver interstate freight committed to their charge, securing safety in railroads and appliances, regulating bridges, improvement of navigable waters, regulating pilots, state quarantine, etc. Mobile Co. v. Kimball, 102 U. S. 691, 26 L. Ed. 238. These laws mostly operate as local aids and instrumentalities of commerce, making it better and safer, and until Congress acts the states have ample power in all such matters, except where the subject admits only of one uniform plan or system, like the regulation of tolls on an interstate bridge, in which case the power of Congress is exclusive. Covington Bridge Co. v. Kentucky, 154 U. S. 204, 14 Sup. Ct. 1087, 38 L. Ed. 962; State Freight Tax, 15 Wall. 243, 21 L. Ed. 146.

Thus the states may regulate charges for local facilities of interstate commerce (Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77; Budd v. New York, 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247), but cannot regulate railway transportation rates thereon, because, among other reasons, this admits of a uniform system (Wabash Case, 118 U. S. 557, 7 Sup. Ct. 4, 30 L. Ed. 244). Agreements relating to such local facilities, possibly enhancing the cost of transportation, but touching national commerce only in an indirect way, or agreements operating in its aid or furtherance by providing facilities for it, cannot be prosecuted as agreements in restraint of interstate commerce. Hopkins v. United States, 171 U. S. 592, 19 Sup. Ct. 40, 43 L. Ed.

290. On the other hand, when the effect of a statute is to limit or prohibit transportation from a point without the state to a point within it, such commerce is regulated, and the effect of the provision in that event is direct and important, and not a mere incident. Railway Co. v. Eubank, 184 U. S. 36, 22 Sup. Ct. 277, 46 L. Ed. 416. But this rule does not apply to statutes preventing the introduction of adulterated foods. Plumley v. Massachusetts, 155 U. S. 461, 15 Sup. Ct. 154, 39 L. Ed. 223. Subjects which more properly admit of local regulation, such as harbor pilotage, harbor improvement, setting beacons and buoys to guide vessels in and out of port, the construction of bridges over navigable waters, the erection and regulation of piers, wharves, and docks, may be provided for by the states, until Congress interferes and supersedes their authority. Bowman v. Railway, 125 U. S. 507, 8 Sup. Ct. 689, 1062, 31 L. Ed. 700. The states may also protect the public health, morals, and safety, and pass regulations to promote order, public convenience, or the general prosperity. Railway v. Haber, 169 U. S. 628, 18 Sup. Ct. 488, 42 L. Ed. 878; Railway v. Illinois (U. S.) 26 Sup. Ct. 341, 50 L. Ed. ——. State inspection laws manifestly intended, and in good faith calculated, to protect the public health, morals, or safety, or prevent deception or imposition upon the public generally, are valid. Patapsco Co. v. North Carolina, 171 U. S. 345, 357, 18 Sup. Ct. 862, 43 L. Ed. 191; Railway v. Haber, 169 U. S. 628, 18 Sup. Ct. 488, 42 L. Ed. 878. It is one thing to force into a state, against its will, articles which are injurious to the public health, like cigarettes, and quite another to force in articles innocuous in their nature. Austin v. Tennessee, 179 U. S. 362, 21 Sup. Ct. 132, 45 L. Ed. 224. And the states may prescribe all such regulations as to the possession, use, and sale of property within its limits as may be necessary to protect the health, lives, and morals of its people; and this power may be applied to all kinds of property, even that which is in its nature harmless. Bowman v. Railway, 125 U. S. 501, 8 Sup. Ct. 689, 1062, 31 L. Ed. 700. They may also create rules of evidence concerning interstate commerce contracts; but, where such contracts are for the transportation of articles from one state to another, they cannot burden or forbid it. Railway v. Tobacco Co. 169 U. S. 314, 18 Sup. Ct. 335, 42 L. Ed. 759. When the state police power and the national commercial power come into direct conflict, the former must give way. Arkansas v. Coal Co., 183 U. S. 189, 22 Sup. Ct. 47, 46 L. Ed. 144. Interstate carriers may be punished or made liable by state laws for misfeasance or negligence committed within their limits, such as a failure to deliver goods to the consignee at the proper time or place, or a negligent injury to a passenger or servant. Smith v. Alabama, 124 U. S. 476, 8 Sup. Ct. 564, 31 L. Ed. 508.

Under these precedents it seems clear that the Wisconsin Legislature might lawfully prevent fraudulent changes of grades, arbitrary or fraudulent "dockage" practiced by warehousemen, and shipping out at a higher grade than that on which the grain was taken in. Such regulations would be in aid and furtherance of commerce by protecting the rights of both buyer and seller. Thus many objections to the Minnesota system, and frauds practiced under it, might be cured.

Such regulations, although indirectly affecting interstate commerce, would be wholly local in their character, and would undoubtedly be sustained. Such regulations might even include inspection and weighing for the purpose of detecting and punishing fraud, preventing changes of grades, fraudulent "dockage," storage, and resale on the weights found before such dockage occurred, etc. All this would be local regulation to protect the public from fraud and imposition, and as such would not be unlawful regulation of interstate commerce.

These considerations and citations of authority do not, however, reach the precise question presented in this case. That question may be thus stated: Given a system or standard of inspection by which all sales and purchases of grain in interstate commerce have for many years been made, by persons in other states, which sales and purchases contemplate transportation and delivery in this state, is it within the power of this state, by reason of the fact that delivery, storage, manufacture into flour, and reshipment are here made, to cripple, supersede, and destroy such foreign system or standard, and compel the vendors, purchasers, carriers, warehousemen, and millers to substitute one of its own? Is this a matter admitting or requiring one uniform system, exclusively within congressional control? And would diverse and conflicting regulations in the different states interested tend to make commercial conflict between such states, and thus require a single system? An examination of the statutes of Wisconsin will show, as I think, that their purpose is to annihilate the Minnesota inspection, and force the exclusive use of the one by them prescribed.

In the original act such change of standard is sought to be brought about, not by express prohibition of sales under Minnesota grades, but by obstructing or preventing delivery, storage, and reshipment except by the Wisconsin system. By this statute it is made a misdemeanor, punishable by fine and treble damages, for a carrier to deliver cars of grain to a warehouseman until inspected under the Wisconsin system, and the charges paid. Warehousemen must store all suitable grain offered to be in all cases so inspected, must store it with grain of similar grade, without mixing. No warehouse receipt must be issued except under Wisconsin grades and weights. Not only must warehousemen give bonds for $10,000, to observe the Wisconsin law, but disobedience of that law is made punishable as a misdemeanor. And the commission was authorized to recognize the Minnesota grades by giving permision to warehousemen to mix grades for a period of six months at any one time. The last provision was repealed by the amendment. The purpose of these provisions cannot be mistaken. It is to make it impossible to buy and sell grain by the Minnesota grades. The purchaser cannot store a bushel of the grain he has bought without having the standard of his purchase destroyed, nor obtain a warehouse receipt under that standard. Grain of different grades as determined by Wisconsin inspection must not be mixed, which is the same thing as saying that the Minnesota grades must be mixed, and the standard of purchase thus confused and destroyed. Delivery, storage, and shipment from warehouses are to be regulated entirely by the Wisconsin grades and weights, and thus the Minnesota

system is sought to be destroyed, and another put in its place; all based upon the inseparable incident of the traffic that a large proportion of the grain must inevitably be delivered and stored in the city of Superior. What is thus, in substance and effect, plainly indicated in the original act is baldly and obtrusively expressed and reiterated in the stringent provisions of the amendment. All sales, contracts of sale and offers to sell outside of Superior are made void. It is made criminal to deliver grain into or out of a warehouse by the Minnesota grades. Storage under those grades is prohibited. And carriers of grain must not deliver it until inspected under the Wisconsin act, and the fees paid.

However justified or necessary these emphatic provisions may have seemed to the Wisconsin Legislature, in order to destroy what appears from the evidence to be a fraudulent system, upheld by the combination of great interests, including buyer, seller, warehouseman, and carrier, they undoubtedly not only operate as a serious obstruction to commerce, as now carried on, under what should be one uniform system, but there is also disclosed a commercial conflict of considerable proportions between two states. Wisconsin is attempting to build up her trade at the expense of Minnesota, and the people most interested have taken, and are now employing, radical, if not unlawful, measures to thwart this attempt and keep this commerce in its accustomed channels. With the view of preventing fraud and protecting the public the Wisconsin Legislature has enacted that all sales of this large product shall be made only in Superior, and delivery, storage, and resale only under her inspection laws. A sale of property in one state for delivery in another is a transaction of interstate commerce. The national commerce includes not only carriage, but the purchase, sale, and exchange of commodities. Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 5 Sup. Ct. 826, 29 L. Ed. 158; Kidd v. Pearson, 128 U. S. 1, 20, 9 Sup. Ct. 6, 32 L. Ed. 346. A sale for delivery beyond the state constitutes interstate commerce. Addyston Pipe & Steel Co. v. U. S., 175 U. S. 211, 239, 20 Sup. Ct. 96, 44 L. Ed. 136. A transaction reaching into two or more states is interstate commerce. U. S. v. Swift (C. C.) 122 Fed. 529; Swift v. U. S., 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518; Welton v. Missouri, 91 U. S. 275, 23 L. Ed. 347. A regulation which imposes burdensome conditions on those engaged in commerce among the states must of necessity be national in its character. Hall v. De Cuir, 95 U. S. 297, 24 L. Ed. 547. Interstate commerce comprehends intercourse for the purposes of trade, including transportation, purchase, sale, and exchange of commodities between citizens of different states, and the power to regulate it embraces all the instruments by which such commerce may be conducted. Hopkins v. U. S., 171 U. S. 597, 19 Sup. Ct. 40, 43 L. Ed. 290; Robbins v. Taxing District, 120 U. S. 497, 7 Sup. Ct. 592, 30 L. Ed. 694. Any agreement which directly operates upon the sale, transportation, and delivery of an article of interstate commerce, by preventing or restraining its sale, thereby regulates such commerce to that extent, and to the same extent trenches upon the power of the national Legislature. Addyston Pipe Case, supra. The sale

in Minnesota affects the transportation of the grain from the yard in Superior by determining its place of delivery, either in Duluth or at some elevator, warehouse, or mill in Superior, and constitutes a sale in one state for transportation and delivery in another.'

The attempt of the Wisconsin statute to prescribe the standard of sale thus appears to be a regulation of commerce. It interferes with and attempts to destroy the grades on which the purchaser depends in making his purchase and succeeding sale. Anything which directly obstructs commerce among the states should be subject to the power of Congress in the regulation of that commerce. Addyston Pipe & Steel Co. v. U. S., supra. State legislation which seeks to interfere directly with the freedom of interstate commerce encroaches upon the exclusive power of Congress. Hall v. De Cuir, supra. Legislation tending to limit or prohibit the transportation of property from without the state to a point within it affects interstate commerce, and may to a certain extent thereby regulate it. Louisville R. Co. v. Eubank, 184 U. S. 36, 22 Sup. Ct. 277, 46 L. Ed. 416. The acts in question "prescribe conditions in accordance with which commerce * * * is required to be conducted." Pittsburg Coal Co. v. Louisiana, 156 U. S. 590, 15 Sup. Ct. 459, 39 L. Ed. 544. The effect of this legislation upon the right and power to make the sales in question is not reflex or remote, but directly obstructive. The grain so sold cannot be freely delivered, stored, or reshipped, because the standard of purchase is seriously impaired, if not destroyed, by the original act, and practically annihilated by the amendment. Freedom of commerce would seem to include the power to buy when and where and how the purchaser may choose. This power is burdened and obstructed by the legislation in question, directly conflicting and hostile to that of Minnesota. It interferes with that equality of rights between the states as to such commerce which was the design of the Constitution, not indirectly or remotely, but palpably and in an important and thorough manner. Veazie v Moor, 14 How. 574, 14 L. Ed. 545.

It is also clear to me that so important a matter as fixing the grades by which grain in interstate transportation can be sold, and without which it cannot be sold on any large scale, admits of one uniform system or plan of regulation, and only one, and therefore falls within the exclusive power of Congress. Certainly it cannot readily be bought and sold according to two systems of inspection. It cannot be bought by one and sold by another. Conflicting state systems would only obstruct. State Freight Tax, 15 Wall. 243, 27 L. Ed. 146, Welton v. Missouri, 91 U. S. 280, 23 L. Ed. 347; Henderson v. Mayor, 92 U. S. 273, 23 L. Ed. 543. Like the regulation of tolls on an interstate bridge, the fixing of a standard of sale for grain moving in interstate commerce admits of only one uniform system. Covington Bridge Co. v Kentucky, 154 U. S. 204, 14 Sup. Ct. 1087, 38 L. Ed. 962. Because also the control of this great grain trade has become a matter of rivalry and commercial conflict between two states, and agencies acting under their respective laws, leads me to think that the subject is one of national and not state regulation. "The power vested in Congress to regulate commerce among the states was designed to prevent

commercial conflicts among them." Groves v. Slaughter, 15 Pet. 507, 10 L. Ed. 800. "The purpose of committing to Congress the regulation of commerce was to insure equality of commercial facilities, by preventing one state from building up her own trade at the expense of sister states." Harlan, J., dissenting, in Bowman v. Railroad, 125 U. S. 520, 8 Sup. Ct. 689, 1062, 31 L. Ed. 700. Its purpose was to place commerce beyond interruption or embarrassment arising from conflicting or hostile state regulations. N. O. Southern Steamship Co. v. Port Wardens, 6 Wall. 32, 8 L. Ed. 749. It was to prevent unjust and invidious distinctions, which local jealousies or local and partial interests might be disposed to introduce and maintain. These were the views pressed upon the public attention by the advocates for the adoption of the Constitution, and the expositions of that instrument by the Supreme Court have been in accordance therewith. Veazie v. Moor, 14 How. 574, 14 L. Ed. 545. "It is undoubtedly true that among the reasons, if not the strongest reason, for placing the power in Congress to regulate interstate commerce," was to insure uniformity of regulation against conflicting and discriminating state legislation. Addyston Pipe & Steel Co. v. U. S., 175 U. S. 211, 227, 228, 20 Sup. Ct. 96, 44 L. Ed. 136. Does not a commercial conflict exist between the agencies of the two states, each struggling to maintain necessarily antagonistic systems of inspection? Is not Minnesota building up her own trade in grain at the expense of Wisconsin, and is not Wisconsin fairly entitled to her share? And is not Wisconsin attempting to get not only her share, but complete domination of the inspection, weighing, and sale of grain? Both systems, as I think, should be held to amount to regulations of interstate commerce, not within the concurrent powers of state and nation, but exclusively subject to congressional control.

Wisconsin, it is said, may lawfully take control of the inspection and weighing of grain held for sale, delivery, and storage within her territory, and may prohibit any other system. Assuming this to be so, and that Minnesota cannot rightfully stop and inspect grain in transit, yet the Legislature of Minnesota, in a spirit of rivalry, or desirous of vindicating its inspection system, might resort to retaliation. Wisconsin having made sales of grain void when made in Minnesota, that state might enact that it should be a crime for any person within her borders to sell any grain under the Wisconsin system. Wisconsin, not to be outdone, follows with other drastic and ingenious reprisals. While such a condition has not yet been reached, commercial warfare already exists, attended by conspiracies, combinations in restraint of trade, and other enormities, as charged in some of the affidavits submitted on these motions. How is it possible to market or sell grain under more than one standard or system of grading? It would seem to be most inconvenient, if not almost impossible, to make use of more than one standard, not only for sale, but storage, and the convenient transfer of warehouse receipts. One system being thus required, sales in interstate commerce can only be regulated by Congress, except by mutual acquiescence of those taking part in the transactions. State Freight Tax, 15 Wall. 232, 21 L. Ed. 146. Large

and extensive police power to protect the public against imposition and fraud must be conceded to the Wisconsin Legislature. It may undoubtedly punish change of grades, "dockage," and the frauds charged which have resulted in arbitrarily increasing the weight of grain shipped out of Superior over that brought in some 26,000,000 of bushels in 10 years, amounting to an annual tribute of about 10 per cent. exacted by elevators and warehouses. But the exercise of such a power is a very different thing from seizing upon transactions taking place beyond the state line, declaring their force, avoiding them, obstructing their execution, and forcing upon interstate commercial transactions a local standard of purchase and sale. It is true that the purchase and sale of articles of interstate commerce by commission merchants upon a board of trade or stock exchange does not itself constitute interstate commerce, and that a combination among such commission men to raise or depress prices is not punishable under the anti-trust act. Hopkins v. United States, 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290. But such a combination is punishable when the owners of the property are themselves the buyers and sellers on such a board. Swift v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518. It appears in the present case that complainant buys and sells its own grain on the Board of Trade of Duluth and Minneapolis; and in any event the purchase and sale of grain in Minnesota for delivery or storage in Wisconsin constitutes interstate commerce, without regard to the persons by whom the sales and purchases are made. As a question of private international law, or the conflict of laws, it is no doubt the settled rule that the sale of property made in one state when the property is either in another state or in transit thereto, and to be there delivered, is a contract whose situs is in the latter state, unless the parties by their contract agree that the title shall pass without delivery. 22 Ency. of Law 1339; Weil v. Golden, 141 Mass. 364, 6 N. E. 229. But this rule has no bearing on the question whether such sales constitute interstate commerce. Although the situs of the sale may be in Wisconsin, the dealing is interstate or national in character. See Addyston Pipe Case, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136, where sales of pipe in certain states for transportation to and delivery in others was held to constitute interstate commerce.

The purpose to destroy the Minnesota inspection for the purpose of selling grain, and substituting the Wisconsin system, was, as I think, the dominant purpose of the statutes in question, without which they would never have been passed. Believing that such statutes constitute a regulation of commerce between the states, they must be held invalid. ·

Temporary injunctions, as prayed for in the bill and in the cross-bill of the Great Northern Railway Company will issue, pending suit, and until further order of the court.

What has been said in this opinion respecting changes of weight, dockage, and arbitrary changes of grades is borne out by the record as presented on these motions, nor was there upon the argument any substantial denial of the facts charged. It should be stated, however,

that the Minnesota Railroad & Warehouse Commission, under whose jurisdiction these frauds are alleged to exist, is not a party to these proceedings, and has no right to appear in any way. Some things have been brought to my attention since the motions were decided which lead me to think that on final hearing the facts may turn out to be different from what they appear to be as shown in the record, and particularly that the 26,000,000 bushels shrinkage in 10 years may turn out to be an exaggeration, if not a mistake. In view of the importance of the interests involved, and the fact that the Minnesota Commission has not been and cannot be heard, I have appended this memorandum to the opinion.