SAMUEL VEAZIE AND LEVI YOUNG, PLAINTIFFS IN ERROR, *v.* WYMAN B. S. MOOR.

The River Penobscot is entirely within the State of Maine, from its source to its mouth. For the last eight miles of its course it is not navigable, but crossed by four dams erected for manufacturing purposes. Higher up the stream there was an imperfect navigation.

A law of the State, granting the exclusive navigation of the upper river to a company who were to improve it, is not in conflict with the 8th section of the 1st article of the Constitution of the United States, and a license to carry on the coasting trade did not entitle a vessel to navigate the upper waters of the river.

THIS case was brought up from the Supreme Judicial Court of the State of Maine, by a writ of error issued under the 25th section of the Judiciary Act.

The facts in the case are stated in the opinion of the court.

It was argued by *Mr. Paine*, for the plaintiffs in error, and by *Mr. Kelley* and *Mr. Moor*, for the defendant in error:

The following propositions were contended for, in an elaborate brief, filed by the counsel for the plaintiffs in error:

1. That the constitutional power of Congress in question, embraces the right to adopt any means reasonably necessary, in their opinion, to the successful prosecution of commerce among the States and with foreign nations.

2. That Congress has adopted, as such means, the whole commercial marine of the country, every part of which, as a unit, is under their entire control and regulation, without regard to the waters on which the navigation is carried on.

3. That to constitute a part of this commercial marine, no other qualifications are necessary than those prescribed by Con

gress in the several acts regulating the registry and enrolment of vessels, and such registry or enrolment is evidence of a compliance with the prescribed conditions.

4. That any vessel so enrolled, being licensed, has an unrestricted right to navigate all the navigable waters of the United States, wherever they may be found serviceable to its use.

5. That the power of Congress to regulate commerce is as extensive on land as water, and is irrespective of both;— that these compose no part of commerce or navigation, but are subject to be adopted as ways or thoroughfares of it, whenever they may be required by the wants of either;— and that in legislating upon the subject, Congress has not discriminated between one class or body of navigable waters and another, but has made all such waters free for the uses of navigation, wherever any portion of the commercial marine of the country may exist.

6. That under the statute of 1831, March 2, § 3, the plaintiffs' boat is expressly included as provided for by said act, and is thus embraced within the power of Congress, even if not included in the general provisions of the acts regulating the "coasting trade."

7. That the right of Congress to regulate "commerce with the Indian tribes," extends to and embraces the Penobscot tribe of Indians, and the Legislature of Maine has no right to restrict the people to, or deprive them of, any particular mode of intercourse or trade with them.

8. That any act of a State Legislature contravening such right of navigation, as does the act set forth in defendants' bill of complaint, is absolutely null and void.

The points made by the counsel for the defendant in error, were thus stated:

The only question here is, whether the grant to Moor is in conflict with that provision of the Constitution which gives Congress the right to regulate commerce.

A party alleging that a State law is unconstitutional, takes on himself the burden of establishing these three propositions:

*First.* That the matter or subject in controversy is within the legislative jurisdiction of Congress.

*Second.* That Congress has *de facto* legislated on the subject, and embraced it within regulations established by its legislation; and

*Third.* That the party impeaching the law, has himself acquired rights in the subject-matter which is in controversy, and that these rights have been invaded by the legislation of the State.

Applying these rules to this case, plaintiffs are bound to show, *First.* That the navigation of the Penobscot River, above Old-town Falls, is within the jurisdiction of Congress.

*Second.* That Congress has embraced this navigation in its legislation, and provided regulations for it; and

*Third.* That they have acquired rights in that navigation under the legislation of Congress, which rights have been impaired by the law of the State.

Plaintiffs must establish all three of these propositions. It is not enough for them to establish any two of them. If they fail in any one of them, they have no ground to stand upon.

1st. As to the first of these propositions. The grant being confined to waters wholly internal, plaintiffs can carry on no navigation by means of those waters, with any foreign nation, nor with any other State. We think this is almost too plain for argument. Moor v. Veazie, 32 Maine Rep. 343; Wilson v. Blackbird Co. 2 Pet. 250; 3 Kent's Com. 458; Livingston v. Van Ingen, 9 Johns. Rep. 506; Gibbons v. Ogden, 17 Id. 488; Id. 9 Wheat. 1; New Bedford Bridge case, 1 Wood. & Minot, 404; Kellogg v. Union Company, 12 Conn. 7; Passenger case, 7 How. 283; Brown v. Maryland, 12 Wheat. 419; New York v. Miln, 11 Pet. 102; 3 Cowen, 713.

Again. This grant is not in conflict with the power of Congress to regulate commerce with the Indian tribes.

1. Because commerce, in this connection, does not include navigation. 32 Maine, 343.

2. Because the constitution manifestly refers only to independent tribes with which the general government may come in conflict; not to those small remnants of tribes scattered over the country, which are under State jurisdiction and guardianship. 32 Maine, 343.

2d. We hold that plaintiffs entirely fail to establish the second proposition, to wit: That the navigation of these waters is embraced within the actual legislation of Congress. None of the acts cited were ever intended to apply to waters wholly within the limits of a State, and which could not be reached by vessels from foreign ports, or from other States.

Again. We contend that if Congress has, or should pass any acts interfering with commerce purely internal, they would be unauthorized and void. Passenger case, 7 How. 283; Genesee Chief, 12 Id. 443.

3d. As to the third proposition, the case fails to show that plaintiffs have acquired any rights in the navigation of the waters of the upper Penobscot, under any regulation of Congress, or in any other way or manner.

Assuredly there can be no pretence that plaintiffs were engaged

in any commerce on those waters with any foreign nation, o
with any other State.   Nor is there any fact or evidence in the
case tending to show that they were engaged in commerce with
the Penobscot tribe.   It does not appear that they traded or
had any intercourse with that tribe, nor that they wished or in-
tended to have any such intercourse.   The Penobscots are not
represented here.   They do not complain of the grant.   There
is no fact going to show that this grant has any bearing or
effect on any commerce to which they are parties.   If they have
any ports of entry or clearance, for aught the case finds, such
ports may be as hermetically sealed as those of Japan.

If plaintiffs fail to show that they have acquired rights which
have been taken away, they cannot complain, even if the act
was most palpably against the constitution.   Wheeling Bridge
case, 13 Howard, 518; East Hartford *v.* Hartford Bridge Com-
pany, 17 Conn. Rep.

Mr. Justice DANIEL delivered the opinion of the court.

The questions raised upon this record, however subdivided or
varied they may have been in form or number, are essentially
and properly restricted to the power and the duty of this court,
to inquire into the constitutional obligation of the law of the
State of Maine, upon which the decision of the Supreme Court
of that State was founded; for if that law and the privileges
conferred thereby, be coincident with the eighth section of arti-
cle 1st of the constitution, they can be assailable here upon no
just exception.

It is insisted, however, that the statute of the State of Maine
is in derogation of the power vested in Congress by the article
and section above mentioned, " to regulate commerce with for-
eign nations, and among the several States, and with the Indian
tribes."   We will examine the character of this objection with
reference to the facts disclosed by the record, and with reference
also to the provisions of the statute in question, as they have
been designed to operate on those facts; and as these last are
all agreed by the parties, there can be no need of a comparison
of the testimony to ascertain their verity.

The River Penobscot is situated entirely within the State of
Maine; having its rise far in the interior of the State, it is not
subject to the tides above the city of Bangor, near its mouth.
Between the city of Bangor and Old Town, a distance of eight
miles, the Penobscot passes over a fall, is crossed by four dams
erected for manufacturing purposes, and for the above space is
not, at this time, and never has been, navigable; but there is a
railroad from Bangor to the steamboat landing at Old Town.
On the 30th day of July, 1846, the Legislature of Maine, by

law enacted, that "William Moor and Daniel Moor, Jr., their associates and assigns, were authorized to improve the navigation of the Penobscot River above Old Town, and for that purpose, were authorized to deepen the channel of the river, to cut down and remove any gravel or ledge, bars, rocks, or other obstructions in the bed thereof; to erect in the bed, on the shore or bank of said river, suitable dams and locks, with booms, piers abutments, breakwaters, and other erections to protect the same; to build upon the shore or bank of said river, any canal or canals to connect the navigable parts of said river, or (in case it shall be deemed the preferable mode of improvement,) any railroads for the like purpose.

After providing the modes of acquiring lands or gravel on the shores or in the bed of the river, and for compensating the owners of property used in the prosecution of the contemplated improvement, the act proceeds to limit the time for the completion of the undertaking, within particular *termini* therein named, to the period of seven years from its date; and farther requires that, within the period thus limited, the grantees shall build and run a steamboat between those *termini*, and shall, within the same time, make a canal and lock around the falls of the river, or a railroad to connect the route above with that below the falls.

Then follows section fourth of the statute, containing the provision objected to. It is in these words: "If said William Moor and Daniel Moor, Jr., their associates and assigns, shall perform the conditions of this grant as contained in the preceding section, the sole right of navigating said river by boats propelled by steam from said Old Town so far up as they shall render the same navigable, is hereby granted to them for the term of twenty years from and after the completion of the improvement, as provided in the third section of this act." The defendant in error, who is assignee of the original grantees from the legislature, having made certain improvements in the river by the removal of rocks, and by deepening the channel in other places, so as to enable boats to run therein, with two and a half feet less of water than was requisite for navigation previously to these improvements, and all within the limit prescribed to him by law, built, and on the 27th of May, 1847, placed upon the said river, the steamboat Governor Neptune, and ran her from Old Town over the Piscataquis Falls, to a place called Nickaton. In the spring of the year 1847, the defendant in error placed on the river the steamboat Mattanawcook, and ran her to Lincoln, till obstructions were removed by him at a place called the Mohawk Rips, above the Piscataquis Falls; and has also built and is now running upon the river, another steamboat

called the Sam Houston, in addition to the Governor Neptune and the Mattanawcook.

The plaintiff in error, Samuel Veazie, built the steamboat Governor Dana, and, in conjunction with the other plaintiffs, Levi and Warren R. Young, ran her upon the Penobscot River between Old Town and the Piscataquis Falls, from the 10th day of May, 1849, until they were arrested by an injunction granted at the suit of the defendant in error. The steamboat Governor Dana was enrolled and licensed for the coasting trade, at the custom-house at Bangor. The Penobscot tribe of Indians own all the islands in the Penobscot River above Old Town Falls, some of which they occupy; and this tribe always have been, and now are, under the jurisdiction and guardianship of the State of Maine.

Upon this state of facts agreed, the Supreme Judicial Court of Maine, after argument and advisement, at its June term, 1850, decreed, that the plaintiffs in error be perpetually enjoined to desist and refrain from running and employing the steamboat Governor Dana, propelled by steam, for transporting passengers or merchandise on said river, or any part thereof above Old Town, and also from building, using, and employing, any other boat propelled by steam on that part of the said river for that purpose, without the consent of the said Wyman B. S. Moor, obtained according to law, until the said Moor's exclusive right shall expire. The court farther decreed to the defendant in error, the sum of one thousand and fifty-two dollars and forty-five cents, for damages and expenses incurred by him, by reason of the interference with his rights on the part of the plaintiffs in error.

Upon a comparison of this decree, and of the statute upon which it is founded, with the provision of the Constitution already referred to, we are unable to perceive by what rule of interpretation either the statute or the decree can be brought within either of the categories comprised in that provision.

These categories are, 1st. Commerce with foreign nations. 2dly. Commerce amongst the several States. 3dly. Commerce with the Indian tribes. Taking the term commerce in its broadest acceptation, supposing it to embrace not merely traffic, but the means and vehicles by which it is prosecuted, can it properly be made to include objects and purposes such as those contemplated by the law under review? Commerce with foreign nations, must signify commerce which in some sense is necessarily connected with these nations, transactions which either immediately, or at some stage of their progress, must be extraterritorial. The phrase can never be applied to transactions wholly internal, between citizens of the same community, or to a polity and laws whose ends and purposes and operations are

restricted to the territory and soil and jurisdiction of such community. Nor can it be properly concluded, that, because the products of domestic enterprise in agriculture or manufactures, or in the arts, may ultimately become the subjects of foreign commerce, that the control of the means or the encouragements by which enterprise is fostered and protected, is legitimately within the import of the phrase *foreign commerce*, or fairly implied in any investiture of the power to regulate such commerce. A pretension as far reaching as this, would extend to contracts between citizen and citizen of the same State, would control the pursuits of the planter, the grazier, the manufacturer, the mechanic, the immense operations of the collieries and mines and furnaces of the country; for there is not one of these avocations, the results of which may not become the subjects of foreign commerce, and be borne either by turnpikes, canals, or railroads, from point to point within the several States, towards an ultimate destination, like the one above mentioned. Such a pretension would effectually prevent or paralyze every effort at internal improvement by the several States; for it cannot be supposed, that the States would exhaust their capital and their credit in the construction of turnpikes, canals, and railroads, the remuneration derivable from which, and all control over which, might be immediately wrested from them, because such public works would be facilities for a commerce which, whilst availing itself of those facilities, was unquestionably internal, although intermediately or ultimately it might become foreign.

The rule here given with respect to the regulation of foreign commerce, equally excludes from the regulation of commerce between the States and the Indian tribes the control over turnpikes, canals, or railroads, or the clearing and deepening of watercourses exclusively within the States, or the management of the transportation upon and by means of such improvements. In truth, the power vested in Congress by article 1st, section 8th of the Constitution, was not designed to operate upon matters like those embraced in the statute of the State of Maine, and which are essentially local in their nature and extent. The design and object of that power, as evinced in the history of the Constitution, was to establish a perfect equality amongst the several States as to commercial rights, and to prevent unjust and invidious distinctions, which local jealousies or local and partial interests might be disposed to introduce and maintain. These were the views pressed upon the public attention by the advocates for the adoption of the Constitution, and in accordance therewith have been the expositions of this instrument propounded by this court, in decisions quoted by counsel on either side of this cause, though differently applied by them.

*Vide* The Federalist, Nos. 7 and 11, and the cases of Gibbons *v.* Ogden, 9 Wheat. 1; New York *v.* Milne, 11 Peters, 102; Brown *v.* The State of Maryland, 12 Wheat. 419; and the License cases in 5 Howard, 504.

The fact of procuring from the collector of the port of Bangor a license to prosecute the coasting trade for the boat placed upon the Penobscot by the plaintiff in error, (the Governor Dana,) does not affect, in the slightest degree, the rights or condition of the parties. These remain precisely as they would have stood, had no such license been obtained. A license to prosecute the coasting trade, is a warrant to traverse the waters washing or bounding the coasts of the United States. Such a license conveys no privilege to use, free of tolls, or of any condition whatsoever, the canals constructed by a State, or the watercourses partaking of the character of canals exclusively within the interior of a State, and made practicable for navigation by the funds of the State, or by privileges she may have conferred for the accomplishment of the same end. The attempt to use a coasting license for a purpose like this, is, in the first place, a departure from the obvious meaning of the document itself, and an abuse wholly beyond the object and the power of the government in granting it.

Upon the whole, we are of the opinion that the decision of the Supreme Judicial Court of the State of Maine is in accordance with the Constitution of the United States, and ought to be, and is hereby, affirmed.

### Order.

This cause came on to be heard on the transcript of the record from the Supreme Judicial Court of the State of Maine, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Supreme Judicial Court in this cause be, and the same is hereby, affirmed with costs.