**BROWN v. PARKER, Director of Agriculture et al.**

**No. 78.**

District Court, S. D. California, N. D.

July 9, 1941.

Irvine P. Aten, Richard V. Aten, and G. L. Aynesworth, all of Fresno, Cal., for plaintiff.

Strother P. Walton, of Fresno, Cal., for the Zone.

W. L. Bowers, Deputy Atty. Gen., for State of California.

Before STEPHENS, Circuit Judge, YANKWICH and BEAUMONT, District Judges.

STEPHENS, Circuit Judge.

The plaintiff, who is a packer of raisins in the State of California, instituted this action to restrain the enforcement of a prorate program for raisins prescribed under the authority of the California Agricultural Prorate Act, Chap. 754, p. 1969, Cal.Stats.1933 as amended, hereinafter called the Act. He has alleged and we hold that he has proved that the issues involve a

sum in excess of $3,000, in that the State of California is attempting to enforce the provisions of the Act and is claiming penalties in the amount of $13,000 against the plaintiff.

It is plaintiff's position that the program formulated under the Act is unconstitutional in that it prevents his purchase in open market for shipment in interstate commerce and that it constitutes a direct interference with interstate commerce in contravention of the provisions of the Federal Constitution.

The defendant Proration Zone No. 1 filed a cross complaint praying that the Act and program thereunder be declared a valid exercise of the police power of the State of California, that the plaintiff be enjoined from refusing to comply therewith, and for an accounting and damages for his failure to comply in the past.

The case was tried before United States Circuit Judge ALBERT LEE STEPHENS and United States District Judges LEON R. YANKWICH and CAMPBELL E. BEAUMONT, sitting as a "three judge court" under the authority of 28 U.S.C.A. § 380, and was submitted upon the question of the constitutionality of the program set up under the Act.[1]

The raisin industry is an important one in California. It is uncontroverted that 95% of the naturally dried raisins consumed in the United States are produced in said Zone No. 1,[2] and 95% of such raisins produced in said zone are consumed outside the State of California. The stipulation of facts filed by the parties shows the following with reference to the customary manner in which the producers of raisin grapes in California, including Zone No. 1, operate:

"The producer of grapes is generally either the owner or the lessee of the land upon which the grapevines are located. * * * The producer picks the bunches of grapes to be utilized for raisins and spreads them on trays laid between the rows of vines, turns the trays from time to time, and finally dumps the dried contents into sweat boxes or picking boxes. The producer grades the same for quality and to eliminate substandard and inferior raisins and sometimes leaves this to be done for him by the packer before the latter takes delivery. When the producer is ready to deliver his raisins, he hauls the same, or employs independent truckers to haul the same, in sweat boxes or picking boxes to the packing plant, or in some cases the packer calls and takes delivery of the same in the vineyard. * * * All raisins sold by producers are sold to such packers in the State of California. Sale is completed when delivery is made and practically all sales are cash transaction, the producer receiving full payment for all raisins delivered immediately or within a ten day period.

"When the raisins are delivered by producers to such packers, they are cured but have not been subjected to any cleaning or other treatment. When delivered in such sweat boxes or picking boxes to the packer, the raisins are in clusters attached to the dried stems upon which they matured, except such as have fallen from said stems and have generally still attached a portion of the stem. * * *

"The raisins received from the producers are stored by the packers in containers upon the premises of the latter and are held by him [sic] in such containers for periods varying from a few days up to two years. * * * The packer at any time or at various times during this period removes the raisins from such containers and prepares the same for commercial sale and distribution to the public by cleaning, stemming, cap-stemming, seeding (muscats only), grading, sorting and packaging in various sized containers. * * *

"When such raisins are so prepared for commercial sale and delivery, the packer delivers the same to jobbers, wholesalers, brokers, distributors, and dealers for resale and distribution to the public.

"From the time of the delivery of raisins by the producer to the packer, as set forth herein, the preparation, care, handling, selling and distributing of such raisins is carried on by such packer and all subsequent purchasers and handlers independently of the producer and entirely free from any control or direction of such producer. * * * No producer has any knowledge of the subsequent movement or ultimate use

---

[1] We have carefully considered the very recent case of Railroad Commission of Texas et al. v. Pullman Co., et al., 61 S. Ct. 643, 85 L.Ed. —— (March 3, 1941) and have concluded that the principles therein treated do not apply to the issues of the instant case.

[2] Zone No. 1 was established pursuant to proceedings initiated under the Act, and includes an area composed of San Joaquin, Stanislaus, Merced, Madera, Fresno, Tulare, Kings and Kern Counties in the State of California.

or consumption of the particular raisins delivered by him and has no right, title or interest in any of such raisins after the sale and delivery by him to the packer. This procedure is carried on by the packer independently of the producer of the raisins who has no knowledge nor means of knowledge as to the ultimate disposition of his particular raisins or as to whether the same ultimately move in intrastate or interstate commerce, except that at times certain producer-packers ship some of their own production directly into interstate commerce."

It will thus be seen that without any prorate provisions in the law, the plaintiff as a packer-dealer would be free to buy and would ordinarily buy the raisins which he boxes and sells in interstate commerce direct from the producer thereof and in amounts limited only by his desire or ability.

Under the Act after a prorate program has been formulated and approved by the commission, [3] the agent appointed to administer the program shall issue to the producers certificates as provided in the Act. These certificates are divided into primary and secondary certificates. Each producer shall be entitled to one primary certificate which identifies him as a "producer" under the terms of the Act. The Act, § 20, as amended by St.1939, p. 1948, provides that "secondary certificates shall be numbered consecutively and shall be used to control the time and volume of harvesting or other preparation for disposal. Such secondary certificates shall accompany all deliveries of the prorated commodity by producers into a primary trade channel," [4] and it shall be unlawful for any prorated commodity to be delivered into a primary trade channel without the necessary secondary certificate therefor. It is also unlawful for any handler to receive or have in his possession without proper authority any such commodity. The Act contains a further provision that "in the case of commodities which are normally concentrated for preparation for market, the program committee may authorize harvesting of the entire crop for the purpose of delivery to a concentration point and subsequent marketing control."

The program formulated under the Act provides that 20% of all "standard" [5] raisins shall be delivered into a surplus pool, [6] the producers to be given an advance of $27.50 per ton for Muscat and Thompson Seedless raisins, and $25 per ton for Sultanas, the advance to be obtained from the proceeds of a nonrecourse loan from the Commodity Credit Corporation, a federal agency.

Fifty percent of all standard raisins are to be delivered into a stabilization pool, the producers to receive an advance from the Commodity Credit Corporation funds of $55 per ton for Muscat and Thompson Seedless raisins, and $50 per ton for Sultanas.

The balance of 30% of standard raisins may be disposed of by the producer without restriction as "free tonnage" provided he has obtained a secondary certificate, which certificate is issued to him when he has satisfied the pool requirements and upon payment of a certificate fee of $2.50 per ton of such free tonnage.

It is provided that no substandard or inferior [7] grade of raisins may be offered as free tonnage or delivered into surplus or stabilization pools, but such raisins are delivered into separate pools for disposal by the program committee at the best prices obtainable and under the fairest conditions obtainable for by-product purposes. The net proceeds are distributed ratably to the producers contributing to such pools.

---

[3] The Act creates an Agricultural Prorate Advisory Commission, and sets up a procedure for the formulation of an agricultural prorate marketing program.

[4] "Primary channel of trade" is defined by the Act to mean "that transaction in which the producer or his cooperative marketing association loses physical possession of the commodity through the sale thereof or other disposition commercially." St.1935, p. 1527, § 2(j).

[5] "Standard raisins" is defined by the Program to mean "raisins of a quality or grade which is equal to, or better than, the quality or grade for standard raisins as determined by the Committee * * *".

[6] The program provides for a determination annually of the marketing policy for the marketing season and for the salable, stabilization and surplus percentages to be applied. The stipulation of facts filed herein states the percentages given herein to be the essential features of the 1940 seasonal marketing program for raisins.

[7] "Sub-standard raisins" is defined by the Program to mean "raisins of a quality or grade below the quality or grade established by the Committee for standard raisins * * *, but which are not inferior raisins." "Inferior raisins" is defined to mean "raisins which are unfit for human consumption, as defined in the Pure Food and Drug Act of the United States of America, 21 U.S.C.A. § 1 et seq., as now in force or as hereafter amended."

Raisins in the surplus pool may be sold by the committee "as soon as practicable after delivery of the same to the committee * * * provided, however, that none of the standard raisins in such pool shall be sold or otherwise disposed of prior to January 1 of the marketing season in which such pool is established". The Committee determines the prices at which the raisins shall be sold, but it is provided in the program that sales of surplus pool raisins shall be only for assured by-product and other diversion purposes, and that they shall not be sold into normal marketing channels. [8] There is a provision for transfer of raisins from the surplus pool into the stabilization pool in the event the original estimates were not in accord with later found facts and it later appears that an excessive quantity of raisins has been placed in the surplus pool.

As to the raisins in the stabilization pool, the program provides that they shall be sold by the committee "as soon as practicable after delivery of same to the committee, * * * in such manner as to maintain stability in the markets and to dispose of such raisins". No sales of raisins from the stabilization pool shall be made at less than the prevailing market price for raisins of the same variety and grade on the date of sale. Stabilization pool raisins shall be sold only into normal marketing channels. There is a provision for transfer of raisins from the stabilization pool into the surplus pool in the event of an error in the original estimates of carry-over, etc. In the disposal of stabilization pool raisins "effort shall be made by the committee to effectuate sales in such fashion that the quantity of such stabilization pool raisins sold from time to time shall be coordinated as closely as possible with market demands therefor." [quotation from Program.]

The producers of the raisins have a limited equitable interest in the raisins in the surplus and stabilization pools, calculated upon a pro rata basis in accordance with the tonnage of each such producer, with adequate and proper differentials for variety and grade, and less deductions for advances made by the committee to such producer.

It will be seen that with the Act and program thereunder in operation, the plaintiff as packer who contracts for delivery of a very large percentage of the raisins he handles directly into interstate commerce cannot freely purchase raisins directly from the producer, for, except as to the "free tonnage" raisins, he must make his purchase from the Zone representatives under restrictions herein mentioned, and as to the 30% free tonnage he must make his purchases only when the raisins are accompanied by the secondary certificate showing full compliance with the program.

There is in evidence a copy of the "Stabilization Pool Sales Policy" set up by the Zone Agent, which recites that the Program Committee reserves the right to determine the eligibility of packers to purchase stabilization pool raisins, and that in order to be eligible to purchase raisins from the committee a packer must be completely current in respect to payment of secondary proration certificate fees. Another item taken into consideration in the determination of eligibility to purchase raisins is whether or not there has been complete proration of all raisins in the packer's possession or on his premises.

It comes to this, that the plaintiff cannot, without violating the provisions of the program, purchase any raisins for his interstate or intrastate business from a grower who does not have the certificate showing his full compliance with the program, and the evidence is clear that plaintiff took orders for out-of-state delivery which he could not fill by purchase of so-called "free tonnage" raisins and could not fill at all because of the program pool without complying with the program. Nor can he under the regulations prescribed by the Program Committee purchase any raisins deposited in the stabilization pool if he has on his premises or in his possession any raisins that are not accompanied by the certificate showing proration by the grower thereof.

Plaintiff in support of his position that the program formulated under the Act is unconstitutional as a direct interference with his shipping raisins in interstate commerce, cites the case of Mutual Orange Distributors v. Agricultural Prorate Commission of the State of California, D.C., 35 F.Supp. 108, recently decided by a three judge court sitting in this District but with different District Judges sitting with the Circuit Judge, and defendants seek to distinguish the case on the facts. Notwith-

---

[8] "Normal marketing channels" is defined to mean "those merchandising channels through which handlers customarily dispose of raisins for human consumption as raisins."

standing its title this cited case has nothing to do with oranges, but is concerned solely with the prorate program for the marketing of lemons. This case will be referred to as the "lemon prorate case". We are of the opinion that notwithstanding factual differences in the two cases, each of them brings very similar principles to bear upon the issues.

Defendants' point of alleged distinction seems to be that in the lemon prorate case the prohibition was on the producers of lemons selling their product in interstate commerce without the secondary certificates provided for in the Act. The lemon proration program prorated among all growers in the State the lemons which could be marketed in primary trade channels. The custom of lemon growers was to sell direct to the trade out of the state. In the instant case the custom of the trade is for the producer of raisin grapes to sell the cured raisins to packers within the state, and the packers in turn sell to jobbers and wholesalers for distribution to the consuming public. The prohibition is on the grower from selling, and the packer from buying raisins on which a secondary certificate has not been issued. The argument is that this is an intrastate transaction, and therefore the program attaches before the raisins have entered interstate commerce, and that it cannot be said that the program constitutes a direct interference with interstate commerce.

Championing the constitutionality of the program the defendants invoke the principle that a State may legally use its police power in the interest of the welfare of its people, even to the extent of affecting interstate commerce. This principle, with its limitations, was discussed by the Supreme Court in Simpson v. Shepard, 230 U. S. 352, 399, 33 S.Ct. 729, 739, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas.1916A, 18, in the following language:

"The power of Congress to regulate commerce among the several states is supreme and plenary. * * * The conviction of its necessity sprang from the disastrous experiences under the Confederation, when the states vied in discriminatory measures against each other. In order to end these evils, the grant in the constitution conferred upon Congress an authority at all times adequate to secure the freedom of interstate commercial intercourse from state control, and to provide effective regulation of that intercourse as the national interest may demand. * * *

"The grant in the Constitution of its own force, that is, without action by Congress, established the essential immunity of interstate commercial intercourse from the direct control of the states with respect to those subjects embraced within the grant which are of such a nature as to demand that, if regulated at all, their regulation should be prescribed by a single authority. * * *

"Thus, the states * * * have no power to prohibit interstate trade in legitimate articles of commerce [citing cases]. * * *"

In Lemke v. Farmers' Grain Co. of Embden, 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458, the Supreme Court had under consideration the constitutionality of a state statute which required purchasers of grain to obtain a license and pay a license fee, and to act under a defined system of grading, inspection and weighing. The defendants in that case, as in the instant case, relied upon the principle that a state may make local laws under its police power which may stand until Congress takes possession of the field under its superior authority to regulate commerce among the States. The Supreme Court rejected the defendants' argument, stating (258 U.S. page 59, 42 S.Ct. page 247, 66 L.Ed. 458),

"This principle has no application where the State passes beyond the exercise of its legitimate authority, and undertakes to regulate interstate commerce by imposing burdens upon it."

The Court reaffirmed its decision in Simpson v. Shepard, supra, and applying the principles laid down in that case, held that the statute under consideration was unconstitutional in that it denied the privilege of engaging in interstate commerce *except to dealers by state authority.* And in United Leather Workers' International Union v. Herkert & Meisel Trunk Co., 265 U.S. 457, page 467, 44 S.Ct. 623, 68 L.Ed. 1104, 33 A. L.R. 566, the Supreme Court said that the statute under consideration in the Lemke case was a direct limitation on interstate commerce.

In Grandin Farmers' Co-op. Elevator Co. v. Langer, Dist. Co. No. Dak. SW Div., 1934, 5 F.Supp. 425, affirmed without opinion, 292 U.S. 605, 54 S.Ct. 772, 78 L.Ed. 1467, the state statute under consideration declared an embargo on its wheat when prices became so low as to become confiscatory. The Court said (5 F.Supp. page 427,),

900

"The state has no power to interfere directly with interstate commerce, regardless of economic conditions. The regulation of such commerce is a matter of national concern. * * * If one state or all the states could place embargoes upon the export of the products of their mines, forests, fields, and oil wells, an inconceivable condition of national insecurity would follow. * * *

"A state statute which, by its necessary operation, directly interferes with or burdens interstate commerce is a prohibitive regulation and invalid, regardless of the purpose for which it was enacted. [citing cases.]"

We think the case of Champlin Refining Co. v. Corporation Commission of Okla., 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403, although sometimes asserted as such, is not authority for the contention that practically unlimited proration of a state's product is within the power of the state. In that case the Supreme Court had under consideration a state statute which curtailed *production* of oil *to prevent waste*. It was there held that production of oil is a mining operation and not a part of interstate commerce even though the product obtained is intended to be and in fact is immediately shipped in such commerce.

In considering the Champlin Refining Co. case, supra, the case of West v. Kansas Natural Gas Co., 221 U.S. 229, 31 S.Ct. 564, 55 L.Ed. 716, 35 L.R.A.,N.S., 1193, should also be taken into consideration. In the West case the state act prohibited foreign corporations from laying pipe lines across highways and transporting natural gas therein to points outside the state. It further provided that domestic corporations must transmit gas only between points in the state, and shall not transport or deliver gas to corporations or persons engaged in transporting or furnishing gas to points outside the state. In holding this statute unconstitutional, the Court distinguished between the police power of the State to regulate the *taking* of a natural product, such as natural gas, from its natural placement, and prohibiting that product from transportation in interstate commerce after removal from its natural placement, saying that the former is within, and the latter beyond, the power of the State. It is stated that gas, *when reduced to possession,* is a commodity and belongs to the owner of the land. It is his individual property subject to sale by him, and may be a subject of intrastate com-

merce and interstate commerce. A state statute which attempts to prohibit its being a subject of interstate commerce is unconstitutional.

In the light of the broad grant of power given Congress over interstate commerce and the principles laid down by the Supreme Court as herein outlined, the necessary effect upon interstate commerce of the raisin prorate program must be scrutinized, and this with the principle in mind that one challenging the validity of a state enactment is not necessarily bound by the legislative declarations of purpose. It is open to him to show that the practical operation of the statute or of any program devised under the authority of such statute directly burdens or effectively prevents the free flow of interstate commerce. Foster-Fountain Packing Co. v. Haydel, 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147.

It may here be stated that the inhibition of the program is not based upon crop limitations or upon the health of the consumer or protection of the industry through exclusion from the market of unfit fruit. Such cases as Sligh v. Kirkwood, 237 U.S. 52, 35 S.Ct. 501, 59 L.Ed. 835, are not in point. And it is not based upon false labeling or deceptive packaging. Neither is it a statute regulating proper conditioning of the commodity prior to its being offered to the consumer. Nor is it a limitation upon submitting ripe grapes to a proper process whereby the grape becomes a marketable raisin. The stipulation itself speaks of the sun dried grape as a "raisin" before it is removed from the vineyard and before it is stemmed, cleaned or packaged.

No facts, claims or argument in this case have been related to the part of the program designated "Green Diversion". There have been no steps taken to change the production of raisins in quantity either above or below the growers' own judgment or desire. We are constrained to hold and do hold that the production of raisins is complete when the grapes dry and cure into raisins. This natural process of drying and curing takes place on the premises where the grapes are grown, and is accomplished without the intervention of anyone either in cooperation or otherwise with the producer (farmer, grower). When the grapes are so dried and cured they are substantially ready for market as raisins. The process of stemming, cleaning, etc. which is not uniform in packing plants, tends to make the

raisins more desirable commercially and thus create a greater demand for them in the market, but is not essential to production. It is our opinion that the prorate program as presented in this case does not attach to or impinge upon "production".

Townsend v. Yeomans, 301 U.S. 441, 57 S.Ct. 842, 81 L.Ed. 1210, is cited as authority for the constitutionality of the Act and program thereunder. There a State statute fixing reasonable maximum charges for the services of warehousemen handling tobacco was held constitutional.

The following quotations from the Yeomans case indicate how widely different the state regulation there concerned is from the one before us:

"* * * We find no ground for concluding that the state requirements lay any *actual* burden upon interstate or foreign commerce. The Georgia act does not attempt to fix the prices at the auction sales or to regulate the activities of the purchasers. The fixing of reasonable maximum charges for the services of the warehousemen in aid of the tobacco growers does not militate against any interest of those who buy." 301 U.S. page 455, 57 S.Ct. page 849, 81 L.Ed. 1210. (Italics the Court's.)

"(quoting from Cargill Co. v. Minnesota, 180 U.S. 452, 470, 21 S.Ct. 423, 45 L.Ed. 619) 'The statute puts no obstacle in the way of the purchase by the defendant company of grain in the state or the shipment out of the state of such grain as it purchased.'" 301 U.S. page 457, 57 S.Ct. page 850, 81 L.Ed. 1210.

"Here, the Georgia act lays no constraint upon purchases in interstate commerce, does not attempt to fix the prices or conditions of purchases, or the profit of the purchasers. It simply seeks to protect the tobacco growers from unreasonable charges of the warehousemen for their services to the growers." 301 U.S. page 459, 57 S.Ct. page 850, 81 L.Ed. 1210.

While it is true that the program purports merely to prevent and regulate the sale of raisins to the packer under the universal custom of his cleaning, stemming and packaging them within the State, the raisins on the producing premises and those stored by the program committee are at all times kept from market except through the operation of the program. It is impossible to avoid the conclusion that the purpose and necessary effect of the program is to place a controlled embargo on the State's raisin production, in order to effect and stabilize

prices. It seems clear to us that the program is frankly and simply a means of controlling the supply of raisins into interstate trade channels to meet the market demands. As to this purpose it is not in our province to comment. We think the State has attempted to accomplish this result by a process which impinges upon a grant of power to the Federal government. The following quotation from the Program is illustrative:

"Secondary Certificates shall be issued to control the time and volume of movement of salable raisins into the primary channels of trade." Article XI, § 1(b).

The Program gives the Committee the power to sell the pooled raisins "in such manner as to maintain stability in the markets", and provides that no sales "shall be made at less than the prevailing market price for raisins of the same variety and grade on the date of sale", and "effort shall be made by the committee to effectuate sales in such fashion that the quantity of such stabilization pool raisins sold from time to time shall be coordinated as closely as possible with market demands therefor".

The "Stabilization Pool Sales Policy" set up by the Committee provides for opening prices ranging from $55 per ton for Sultanas to $60 per ton for Thompson Seedless Raisins. It is stated "Notwithstanding anything herein to the contrary, the above opening prices will not be reduced by the sales policy committee of the Surplus Marketing Administration within sixty (60) days from the effective date hereof [Jan. 1, 1941]."

In a printed communication sent out by the Proration Program Committee to the raisin producers within the zone, it is stated that the program "* * * was based upon the idea * * * that a large part of the 1940 crop should be placed in pools under Committee supervision to prevent a flooding of the few available markets, with the inevitable price decline which goes with flooded markets".

By every authority of our acquaintance the enforcement of the implementing program under the Act constitutes a direct and illegal interference with interstate commerce.

It is no answer in principle to say that under the terms of the program 30% [free tonnage] of produced raisins are available for the open market. This percentage is fixed by the program as best calculated to serve its purposes, it might be 15% of the crop or none at all. The vice of the situation is that the program requires the sub-

mission of any properly marketable part of the crop to its terms, all of which are directed to the control of the commodity into commerce. It is the judgment of the program administrators that such purpose will be advanced with the freeing of 30% of the crop at the beginning of the 1940-1941 season's market. After the release of the 30% free tonnage the amount of raisins which may be released for absorption by the market equated from the pool is also wholly within the judgment of the prorate authorities.

We are reminded of Mr. Justice McKenna's illustration in the case of Heisler v. Thomas Colliery Company, 260 U.S. 245, 43 S.Ct. 83, 84, 67 L.Ed. 237, wherein he sustains the State's right to a tax on coal "washed or screened, or otherwise prepared for market" and remarks that if the subject matter is under Congressional jurisdiction because the coal will enter interstate commerce "The result would be curious. It would nationalize all industries, it would nationalize and withdraw from state jurisdiction and deliver to federal commercial control the fruits of California and the South, the wheat of the West," etcetera. But, on the other hand, if the State of California has the power to execute a control plan of its entire fruit crop and permit it to enter the market for consumption only as and when its administrators adjudge proper, then every state can so control all industries and crops within its boundaries by the same token. This presents a condition certainly no less repugnant to our dual system of State and Federal government than that illustrated by Mr. Justice McKenna, a condition in the situation confronting us which the constitutional fathers sought to guard against by writing the commerce clause into the Constitution itself. [See hereinbefore quoted portion of the opinion in the case of Grandin Farmers' Co-op. Elevator Co. v. Langer, supra.] In our opinion the State has ventured upon a sphere of governmental activity which impinges upon a constitutional provision which the framers of the Constitution recognized as necessary to the national status of the several states in their Union.

■ It is our duty to declare the law as we see it. We cannot however fail to appreciate the economic effect of our decision in this case. It may not be out of place therefore to mention here the highly fortunate circumstance that there is federal law and administrative machinery available by which a proper and legal proration of the raisin crops may be accomplished if such is generally held to be desirable.

The petition for a decree permanently enjoining the defendants from enforcement of the raisin prorate program hereinbefore referred to is granted. The relief sought by defendants in their cross complaint is denied. Plaintiffs may draw findings of fact and conclusions of law in conformity with the expressions of this opinion.

In view of the fact that the case was submitted solely on the question of the constitutionality of the program, we do not consider the defenses of estoppel and the statute of limitations raised by the defendants in their pleadings.

YANKWICH, District Judge (dissenting).

The control of the Congress over interstate commerce, United States Constitution, Art. I, § 8, Cl. 3, being absolute, any direct interference with it by any State must give way. But this Congressional primacy does not stand in the way of regulations by the States, through the exercise of their taxing or police powers, which, although local in their nature, affect interstate commerce. See The Minnesota Rate Cases, 1913, 230 U.S. 352, 399, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas.1916A, 18; Milk Control Board v. Eisenberg Farm Products, 1939, 306 U.S. 346, 351, 59 S.Ct. 528, 83 L.Ed. 752; United States v. Rock Royal Co-Op., 1939, 307 U.S. 533, 569, 59 S.Ct. 993, 83 L.Ed. 1446; Mulford v. Smith, 1939, 307 U.S. 38, 48, 59 S.Ct. 648, 83 L.Ed. 1092.

In a recent case (California v. Thompson, 1941, 61 S.Ct. 930, 932, 85 L.Ed. ——), Mr. Justice Stone has stated the extent of compatibility of state regulation with national supremacy in the field of interstate commerce in these words:

"As this Court has often had occasion to point out, the Commerce Clause, in conferring on Congress power to regulate commerce, did not wholly withdraw from the states the power to regulate matters of local concern with respect to which Congress has not exercised its power, even though the regulation affects interstate commerce. Ever since Wilson v. Blackbird Creek Marsh Co., 2 Pet. 245, 7 L.Ed. 412, and Cooley v. Board of Port Wardens, 12 How. 299, 13 L.Ed. 996, it has been recognized that there are matters of local concern, the regulation of which unavoidably involves

some regulation of interstate commerce, but which because of their local character and their number and diversity may never be adequately dealt with by Congress. Because of their local character, also, there is wide scope for local regulation without impairing the uniformity of control of the national commerce in matters of national concern and without materially obstructing the free flow of commerce which were the principal objects sought to be secured by the Commerce Clause. Notwithstanding the Commerce Clause, such regulation in the absence of Congressional action has, for the most part, been left to the states by the decisions of this Court, subject only to other applicable constitutional restraints. See cases collected in Di Santo v. Pennsylvania, supra, 273 U.S. [34] 40, 47 S.Ct. 267, 71 L. Ed. 524."

When we consider Congressional regulation of interstate commerce, we must, as students of late juristic trends, concede that recent decisions, such as those sustaining the National Labor Relations Act, 29 U.S. C.A. § 151 et seq. (National Labor Relations Board v. Jones-Laughlin Corp., 1937, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352) and the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. (United States v. Darby, 1941, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. ——, 132 A.L.R. 1430), extend the power of the Congress to dominate purely local conditions, through the exercise of its absolute control over interstate commerce.[1]

But this *does not mean* that because a product is destined for interstate commerce, or a business aims at interstate commerce, it is, *by this very fact,* without the ambit of state regulation. Carriers or persons engaged in transportation in interstate commerce may be subjected to many state regulations. See their enumeration by Mr. Justice Stone in California v. Thompson, 1941, 61 S.Ct. 930, 85 L.Ed. ——. So, also, may the taxing power of a state be used to tax products originating in, or intended for, interstate commerce, either before leaving the state or after reaching it. See Henneford v. Silas Mason Co., 1937, 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814; Ford Motor Company v. Beauchamp, 1939, 308 U.S. 331, 60 S.Ct. 273, 84 L.Ed. 304; Felt &

Tarrant Manufacturing Co. v. Gallagher, 1939, 306 U.S. 62, 59 S.Ct. 376, 83 L.Ed. 488; Pacific Tel. & Tel. Co. v. Gallagher, 1939, 306 U.S. 182, 59 S.Ct. 396, 83 L.Ed. 595; McGoldrick v. Berwind-White Co., 1940, 309 U.S. 33, 60 S.Ct. 388, 84 L.Ed. 565, 128 A.L.R. 876.

While the rigid distinction between production and commerce no longer holds in so far as the exercise of congressional restraint and regulation is concerned, (See United States v. Darby, 1941, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. ——, 132 A.L.R. 1430), it is still maintained when we come to assay the exercise of state powers. In a leading case on the subject, (Heisler v. Thomas Colliery Co., 1922, 260 U.S. 245, 43 S.Ct. 83, 86, 67 L.Ed. 237), Mr. Justice McKenna stated the principle in these words:

"We may, therefore, disregard the adventitious considerations referred to and their confusion, and by doing so we can estimate the contention made. It is that the products of a state that have, or are destined to have, a market in other states *are subjects of interstate commerce,* though they have not moved from the place of their production or preparation.

"The reach and consequences of the contention *repels its acceptance.* If the possibility, or indeed certainty, of exportation of a product or article from a state determines it to be in interstate commerce before the commencement of its movement from the state, it would seem to follow that it is in such commerce from the instant of its growth or production, and in the case of coals, as they lie in the ground. The result would be curious. *It would nationalize all industries, it would nationalize and withdraw from state jurisdiction and deliver to federal commercial control the fruits of California and the South, the wheat of the West and its meats, the cotton of the South, the shoes of Massachusetts and the woolen industries of other states at the very inception of their production or growth, that is, the fruits unpicked, the cotton and wheat ungathered, hides and flesh of cattle yet 'on the hoof,' wool yet unshorn, and coal yet unmined because they are in varying percentages destined for and surely to be exported to states other than*

---

[1] These decisions overrule all the cases, such as Hammer v. Dagenhart, 1918, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101, 3 A. L.R. 649, Ann.Cas.1918E, 724, and Carter v. Carter Coal Co., 1936, 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160, which, if followed, would have made it impossible for the Congress to influence, by indirect regulation, industrial relations within state confines.

*those of their production."* Heisler v. Thomas Colliery Co., 1922, 260 U.S. 245, 259, 43 S.Ct. 83, 67 L.Ed. 237. (Italics added.)

And see Veazie v. Moor, 1852, 14 How. 568, 573, 574, 14 L.Ed. 545; Kidd v. Pearson, 1888, 128 U.S. 1, 20, 21, 9 S.Ct. 6, 32 L.Ed. 346; Oliver Iron Co. v. Lord, 1923, 262 U.S. 172, 178, 179, 43 S.Ct. 526, 67 L. Ed. 929.

The act there before the Court subjected every ton of anthracite coal mined "washed, screened, or *otherwise prepared for market"* in the state to a one and one-half percent tax of its value when prepared for market, to be assessed after it is prepared as indicated and "is ready for shipment or market." Penn.Laws, 1921, page 479, 72 P.S.Pa. § 2501.

Here was a product, anthracite coal, on which many states depended at the time, for fuel, found only in a small number of counties in the State of Pennsylvania, and, from its very nature, destined for interstate commerce the moment it left the mine. Here was a tax, the effect of which made the cost of production greater and sale in interstate commerce more burdensome. Yet the Court could see in it no assault upon federal supremacy in the realm of interstate commerce.[2]

I can see no escape from this conclusion.

Unless we are ready to say that the recent decisions extending congressional power to regulate local conditions, through the exercise of control over interstate commerce, have destroyed the power of the States to deal with products of agriculture or manufacture which are destined for interstate commerce before they actually enter the flow of that commerce. Even the most extreme of the newer federalists would not go so far. See Walton H. Hamilton and Douglass Adair, 1937, The Power to Govern; Edward Corwin, 1926, The Commerce Power versus State Rights; Edward Corwin, 1941, Constitutional Revolution Limited.

The thoughts just expressed find support in Champlin Refining Co. v. Commission, 1932, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403, which involved the Oklahoma oil prorate law. It is true that oil, being a natural resource, allows, constitutionally, broader regulation both federal and state, than other products of industry or agriculture. And the Court said so. However, the Court, while giving its sanction to the State's regulation upon that score, also dealt specifically with its relation to the interstate commerce clause. And, in finding no conflict with it, the Court did not place its decision upon *the character of oil as a natural resource.* It determined the case upon the ground that the law was a regulation of production before oil entered the flow of interstate commerce. And it found it unobjectionable, although the oil was intended for interstate shipment. The Court said:

"Plaintiff contends that the act and proration orders operate to burden interstate commerce in crude oil and its products in violation of the commerce clause. * * * It is clear that the regulations prescribed and authorized by the act and the proration established by the commission apply only to production and not to sales or transportation of crude oil or its products. Such production is essentially a mining operation, and therefore is not a part of interstate commerce, even though the product obtained *is intended to be and in fact is immediately shipped in such commerce.* Oliver Iron Co. v. Lord, 262 U.S. 172, 178, 43 S.Ct. 526, 67 L.Ed. 929; Hope Gas Co. v. Hall, 274 U.S. 284, 288, 47 S.Ct. 639, 71 L.Ed. 1049; Foster Packing Co. v. Haydel, 278 U.S. 1, 10, 49 S.Ct. 1, 73 L.Ed. 147; Utah Power & Light Co. v. Pfost, supra [286 U.S. 165, 52 S.Ct. 548, 76 L.Ed. 1038]. No violation of the commerce clause is shown." Champlin Refining Co. v. Commission, 1932, 286 U.S. 210, 235, 52 S.Ct. 559, 565, 76 L.Ed. 1062, 86 A.L.R. 403. (Italics added.)[3]

[2] This case was decided *after* Lemke v. Farmers' Grain Co., 1922, 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458, upon which my associates' finding of unconstitutionality of the raisin program is chiefly bottomed. And the opinion was written *by the same justice,* Mr. Justice McKenna. The principles it declares have never been questioned. Some of the later cases in which it is cited or followed are: Oliver Iron Co. v. Lord, 1923, 262 U.S. 172, 179, 43 S.Ct. 526, 67 L.Ed. 929; United

Leather Workers' International Union v. Herkert & Meisel Trunk Co., 1924, 265 U.S. 457, 465, 44 S.Ct. 623, 68 L.Ed. 1104, 33 A.L.R. 566; Hope Gas Co. v. Hall, 1927, 274 U.S. 284, 288, 47 S.Ct. 639, 71 L.Ed. 1049; McGoldrick v. Berwind-White Co., 1940, 309 U.S. 33, 47, 60 S.Ct. 388, 84 L.Ed. 565, 128 A.L.R. 876.

[3] The California Agricultural Prorate Act was enacted on June 5, 1933, St.1933, p. 1969, after the decision in Champlin

In effect, this means that the nature of a product does not determine its availability as an object of state legislative control outside of the inhibition of the commerce clause. Rather must the question be determined in the light of the facts in each case. A state embargo upon a product is forbidden. See Lemke v. Farmers' Grain Co., 1922, 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458; Shafer v. Farmers' Grain Co., 1925, 268 U.S. 189, 45 S.Ct. 481, 69 L.Ed. 909; Baldwin v. Seelig, 1935, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032, 101 A.L.R. 55. But state enactments or programs which affect, *indirectly,* either through regulation or taxation, the quantity of a product available for use in interstate commerce before it enters it, do not, as I read the cases, impinge upon the commerce clause.[4] To hold otherwise is to bring about the conditions which Mr. Justice McKenna envisaged in Heisler v. Thomas Colliery Co., supra. It is to remove every product, the sale of which is ultimately an interstate act, from local control. For if every regulation which may affect the quantity of the product available for interstate shipment be violative of the commerce clause, state statutes regulating the quantity and conditions of production of an article of commerce, or the wages or hours and conditions of labor of employees producing it, must go by the board. And the reason is obvious. For such legislation, from an economic standpoint, ultimately affects production. It increases the burden upon production and discourages those who consider the burden oppressive from engaging in such enterprise.

And this is true, whether we consider restrictions on working hours of men (California Labor Code, St.Cal.1937, p. 205 et seq., §§ 510–856) or of women and children (California Labor Code, §§ 1171–1398, p. 213 et seq.) regulations of the manner of payment of wages (California Labor Code, §§ 200–452, p. 201 et seq.), minimum sanitation requirements (California Labor Code, §§ 2330–2425, p. 253 et seq.), or laws establishing employers' liability (California Labor Code, §§ 3201–6002, p. 265 et seq.), or decreeing safety devices (California Labor Code, §§ 6300–7601, p. 306 et seq.).

They all increase cost and, therefore, diminish the quantity of production. It is also axiomatic that free, unregulated, anarchic enterprises attract the intrepid and adventurous in the economic field more readily than strictly controlled ventures. Control thus diminishes production in existing establishments and discourages increase in the number of enterprises.

It follows that if the fact that a product is destined for interstate commerce, automatically places it without the scope of state control, then control of the type enumerated is immediately nullified.

To bring these thoughts to bear upon the problems before us.

Raisins as produced by the grower, through the drying and sweating process, from grapes grown on his land, are not an article of commerce. They are not ready for shipment or market. Nor are they fit for human consumption. Before they may be served as human food, the packers must process them through a complicated process. This alone makes them palatable and fit for use. The State of California has undertaken, through this legislation, and the program intended to carry it into effect, to impose certain regulations, to pool a portion of the crop and to restrict free sales as between the growers and the packers. This program, which derives its sanction from

---

Refining Co. v. Commission, 1932, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403, which was filed on May 16, 1932. It was modeled after the Oklahoma Oil prorate statute which the Court had before it in that case. Its definition of "waste" is almost identical with that in the Oklahoma Statute. It reads:

"The terms 'agricultural waste'—in addition to their ordinary meaning—shall include economic waste, and waste incident to the harvesting and/or preparation for any delivery to market of agricultural commodities in excess of *reasonable market demands.*" (Calif.Stats.1933, Ch. 754, Sec. 2, as amended by St.1935, p. 1527 (b) (Italics added.)

The definition of waste in the Oklahoma Statute, 52 Okl.St.Ann. § 273 (as found in a footnote to page 223 of 286 U.S., 52 S.Ct. at page 560 of the opinion) reads:

"That the term 'waste' as used herein, in addition to its ordinary meaning, shall include economic waste, underground waste, surface waste, and waste incident to the production of crude oil or petroleum in excess of transportation or marketing facilities or *reasonable market demands.*" (Italics added.)

[4] A very recent illustration of judicial sanction for a state regulation of the handling of what might be called an inherently interstate commodity, tobacco, is found in Townsend v. Yeomans, 1937, 301 U.S. 441, 57 S.Ct. 842, 81 L.Ed. 1210.

the assent of the growers, deals entirely with raisins before they enter the flow of interstate commerce. I grant that its effect is to restrict freedom of action in dealings between growers and packers within the state. If this result in making raisins unavailable to recusants like the plaintiff, except upon compliance with certain conditions, this is no more a direct burden on interstate commerce than was the tax on anthracite coal (Heisler v. Thomas Colliery Co., supra), *without the payment of which no anthracite coal was available for shipment in interstate commerce,* or the curtailment of oil production, through proration, (Champlin Refining Co. v. Commission, supra), *which reduced directly the quantity of oil available for shipment in interstate commerce.*

Hence my dissent from the conclusion reached by my colleagues.